## MUTUAL LIFE INS. CO. OF NEW YORK v. LOGAN.

### (Circuit Court of Appeals, Ninth Circuit. February 28, 1898.)

### No. 383.

**1. ACTION ON INSURANCE POLICY—EVIDENCE—DECLARATIONS.**

In a suit by an executor to collect an insurance policy upon the life of his testator, when the issue is whether or not the contract was consummated, it is error to allow the plaintiff to testify to declarations by his testator going to show that he acknowledged liability upon his premium note, in order to show an acceptance by him of the policy. The suit being on the policy, and not on the note, such declarations cannot be considered as against interest.

**2. SAME—RES GESTÆ.**

Declarations made 10 days after the alleged delivery of an insurance policy cannot be admitted in evidence, as part of the res gestæ, to show such delivery.

**3. INSURANCE—PREMIUM NOTE—AUTHORITY OF AGENT TO ACCEPT.**

The agent of a life insurance company, authorized to close the contract by delivering the policy and collecting premiums, has, in general, implied authority to accept notes for the premiums.

**4. SAME—RULES OF COMPANY—VIOLATION—WAIVER.**

When the general agent of an insurance company has knowledge of frequent violations by a subagent of a rule of the company prohibiting the acceptance of notes for premiums, and makes no serious objection, the company must be deemed to have waived the application of the rule.

**5. SAME—EFFECT AS TO THIRD PARTIES.**

A person dealing with an insurance company cannot be bound by a rule of the company forbidding the taking of premium notes, which is intended for the guidance of its agents, and of which he has no knowledge.

**6. SAME—INSTRUCTIONS—PREMIUM NOTE—ALLOWANCE BY EXECUTOR.**

Where a premium note has been negotiated by the agent of the company, and, on presentation by the assignee, allowed by the maker's executor as a claim against the estate, it is error to refuse to instruct that such action by the executor cannot bind the company, the issue being whether or not the contract was ever consummated.

**7. TRIAL—WEIGHT OF EVIDENCE.**

When there is a variance between the testimony of a witness and statements made by him in letters at the time of the transaction in question, and the letters are in evidence, it is error to instruct that greater weight must be given to the testimony than to the statements in the letters. It is for the jury to say which statement they will accept.

In Error to the Circuit Court of the United States for the District of Oregon.

The action was brought by Lysander S. Logan, the defendant in error, as executor of the last will and testament of Thomas J. Logan, deceased, to recover $10,000 and interest, alleged to be due upon a certain policy of insurance claimed to have been issued by plaintiff in error, the Mutual Life Insurance Company of New York, upon the life of Thomas J. Logan. The case was tried in the court below before a jury, which rendered a verdict for the plaintiff, the defendant in error here, in the sum of $10,000, with interest at 6 per cent. per annum from September 28, 1894. Judgment was entered December 28, 1896, to reverse which the defendant sued out this writ of error.

The policy in question was for the sum of $10,000, was numbered 581,368, and was issued by the company on August 28, 1893. The defense interposed in the court below was that the contract of insurance was never consummated

by Thomas J. Logan. That was the only issue in the case. Thomas J. Logan resided near Prineville, Crook county, Or., and on the 26th day of August, 1893, signed an application for insurance, and at the same time and place executed a promissory note payable to his own order for the sum of $1,185, due on November 1st thereafter, payable at the First National Bank of Prineville. The sum of $1,185 was the amount of the premium. The note was indorsed in blank by the maker, and delivered at the time of the signing of the application to one William Johnson, who appears to have been a solicitor of insurance. The application was accompanied with a medical examiner's report, also signed by Thomas J. Logan, and made by H. P. Belknap, medical examiner, of the same date, and was forwarded to one F. L. Stinson, an agent of the defendant company at Seattle, Wash., and was by him in turn forwarded to A. B. Forbes & Son, at San Francisco, the general agents of the plaintiff in error for the Pacific Coast, and by them in turn forwarded to the home office of the company, in New York. Thereafter a policy in the form called for by the application was issued, and forwarded to Stinson, at Seattle.

On October 18, 1893, Stinson wrote Logan, from Seattle, the following letter:

"The Mutual Life Insurance Company of New York. Richard A. McCurdy, President. F. L. Stinson, General Agent for Washington and Oregon.

"Seattle, Washington, Oct. 18th, 189–.

"Thos. J. Logan, Esq., Prineville, Or.—Dear Sir: I take pleasure in informing you that the company have accepted your risk for $10,000, and have issued policy No. 581,368, and I have forwarded same this day, together with your note for $1,185, to the First National Bank of Prineville, where the latter is payable. If you wish to take the note up at once, I will allow you a discount of 1 per cent. from the face value. * * *

"Yours, very truly,                    F. L. Stinson, General Agent."

Stinson also wrote and sent the following letter to the First National Bank of Prineville:

"The Mutual Life Insurance Company of New York. Richard A. McCurdy, President. F. L. Stinson, General Agent, Washington, Oregon.

"Seattle, Washington, Oct. 18th, 1893.

"First National Bank, Prineville, Or.—Dear Sirs: Inclosed please find policy No. 581,368, T. J. Logan, amount, $10,000, together with his note due Nov. 1st, in amount $1,185, which please collect and remit, less your charges, cost of exchange, etc. Kindly deliver the policy to Mr. Logan upon payment of note. If he wished to pay same at once, 1 per cent. from the face of note will be deducted.

"Yours, very truly,                    F. L. Stinson, General Agent."

To this communication the bank made the following reply:

"First National Bank, Prineville, Or.

"Prineville, Oregon, 11–1, 1893.

"F. L. Stinson, Esq., Genl. Agent, Seattle—Dear Sir: * * * Policy of T. J. Logan received. Mr. Logan says he is unable to pay, and desires that the policy be surrendered, and note returned to him. Please advise. * * *

"Yours, respectfully,                    T. M. Baldwin, Cashier."

Stinson thereupon advised the bank as follows, under date of November 6, 1893:

"First National Bank, Prineville, Oregon—Dear Sirs: I have your favor of the 1st inst. * * * Regarding T. J. Logan, I note what you say. Please hold the policy subject to his call; that is, when he pays the note, deliver same to him. If the note is not paid within four days from receipt of this letter, kindly return same to me, and I will proceed to collect same. Will you kindly advise me if Mr. Logan is good for the amount of his note? If he will pay one-half of the face of the note, kindly accept and indorse same, and have promised him time to pay the balance. Thanking you in anticipation of an early reply,

"Yours, very truly,                    F. L. Stinson, General Agent."

He also, on the same day, wrote to Thomas J. Logan the following letter:

"The Mutual Life Insurance Company of New York. Richard A. McCurdy, President. F. L. Stinson, General Agent, Washington, Oregon.

"Seattle, Washington, Nov. 6th, 1893.

"T. J. Logan, Esq., Prineville, Or.—Dear Sir: I am advised by the First National Bank, under date of the 1st inst., that you state that you are unable to meet your note of $1,185, which I had sent to the above bank for collection, same being due on Nov. 1st. I had hoped that you would have met this note promptly, and trust that upon receipt of this you will take the same up immediately. If unable to pay the full amount, if you will pay half of the note I will give you time on the balance. I must insist, however, upon the payment of at least half immediately. Kindly let me hear from you by return mail, and oblige,

"Yours, very truly,                    F. L. Stinson, General Agent."

The bank, on the 14th of November, 1893, sent the following communication to Stinson:

"First National Bank of Prineville.

"Prineville, Or., Nov. 14th, 1893.

"F. L. Stinson, Esq., General Agent, Seattle, Wash.—Dear Sir: I return herewith your note on T. J. Logan for $1,185.00. Payment refused. Mr. Logan refuses to accept policy.

"Yours, very truly,                    T. M. Baldwin, Cashier."

To this letter Stinson sent the following letter to the bank:

"The Mutual Life Insurance Company of New York. Richard A. McCurdy, President. F. L. Stinson, State General Agent, Washington, Oregon.

"Seattle, Washington, Nov. 20th, 1893.

"First National Bank, Prineville, Or.—Dear Sirs: I have your favor of the 14th inst., returning note of T. J. Logan, in amount $1,185. Please hold the policy subject to Mr. Logan's call. Kindly advise me the amount of expenses for your trouble in this matter, and I will remit.

"Yours, very truly,                    F. L. Stinson, General Agent."

Thereafter the policy appears to have continued in the possession of Baldwin until March 29, 1894, when he returned the same to W. S. Pond, at that time the cashier of the plaintiff in error, at Seattle, Washington, upon a request as contained in the following letter:

"The Mutual Life Insurance Company of New York. Richard A. McCurdy, President. F. L. Stinson, State General Agent, Washington, Oregon.

"Seattle, Washington, March 24, 1894.

"First National Bank, Prineville, Or.—Dear Sirs: Kindly send the Logan policy here, No. 581,368, as per inclosed order from Mr. F. L. Stinson, and oblige,

"Yours, very truly,                    Wm. S. Pond, Cashier."

It was subsequently sent on to the company's home office for cancellation. The note was returned to Stinson, as per his request, on or about November 20, 1893. It was by him given to the National Bank of Commerce, at Seattle, Wash., to secure the payment of advances made to him by the bank prior to November 25, 1893, and for further advances to be thereafter made. On November 25, 1893, the note was mailed by the bank to one J. Park Henderson, an attorney at law, at Portland, Or., to endeavor to collect for the bank. Suit was thereupon brought on the note on November 29, 1893, by Henderson. A demurrer, answer, and reply were successively filed, and it appears that on May 7, 1894, following, the suit was dismissed without prejudice by order of court, on motion of counsel for defendant, Thomas J. Logan. Nothing appears to have been done in regard to collection of the note, beyond its being held by the National Bank of Commerce as collateral for moneys theretofore and thereafter advanced to Stinson, until August 31, 1894, when it was sent by the National Bank of Commerce to the First National Bank of Prineville, Or., in a letter

dated July 31, 1894. It was returned to the National Bank of Commerce by a letter dated August 29, 1894, which reads as follows:

"First National Bank of Prineville.

"Prineville, Or., Aug. 29th, 1894.

"The National Bank of Commerce, Seattle, Wash.—Dear Sirs: We return herewith your collection, No. 8,553, T. J. Logan, for $1,185. and interest. T. J. Logan, the maker, is now dead, and his son, L. S. Logan, is the executor of his will. He informs me that the note will have to take the regular course of such matters in this state. A copy of the note, duly sworn to, must be filed with the executor, and paid by order of the probate judge.

"Yours, very truly,                [Signed]    T. M. Baldwin, Cashier."

It further appears that the note was thereafter filed and proved up against the estate of Thomas J. Logan, deceased, by the National Bank of Commerce. The latter died at Prineville, Or., July 10, 1894.

The deposition of Baldwin, the cashier of the First National Bank of Prineville, was introduced in evidence, from which it appears that he testified as follows in regard to his possession of the policy and his conversations with Logan in regard to it: That he knew Thomas J. Logan; that he (the witness) was cashier of the First National Bank at Prineville, Or., and had been such for nine years past continuously; that he was cashier in November, 1893, and remembered receiving a promissory note signed by Thomas J. Logan, dated at or near Prineville, Or., August 26, 1893, whereby said Logan promised to pay to the order of himself, on November 1, 1893, the sum of $1,185, with interest; that he received the letter of October 18, 1893, from F. L. Stinson, containing policy of insurance No. 581,368, with the note above referred to. The deposition showed that the witness was asked the following question, among others, upon examination in chief: "Q. What did you do with the policy after receiving this letter?" After objection and exception, he replied: "I filed it in Mr. Logan's name in the bank." That the policy was placed in a case kept for that purpose, alphabetically arranged, under Mr. Logan's initials; that the case was kept for the purpose of holding the papers of customers of the bank; the bank habitually had papers there belonging to Mr. Logan, but could not say that any were there at that particular time; the papers were kept for safe-keeping; that it was customary for the bank to receive and safely keep papers for its customers and patrons; that Mr. Logan was a patron of the bank, and that there was a definite understanding between the bank and Mr. Logan that the bank should keep his papers for safe-keeping, they being left there and received by the bank as an accommodation to him; that the custom alluded to had existed ever since the bank was organized, which was about six years prior to the date last referred to; that upon the receipt of the letter from Stinson of October 18, 1893, he gave the policy and note to Logan; that he thinks Logan took the policy in his hands, and then handed it back; that Logan did not refuse absolutely to accept the policy; that Logan did not instruct him to return the policy, but that he did not remember that Logan instructed him to keep the policy for him; that Logan told him that, if he could not raise the money, he would like to return the policy; that he received no instructions or directions with relation to this policy from Logan after November 14, 1893; that he did not remember having any communication with him or any one acting for him after that time; that he might not remember, as it was a good while ago; that he did not remember that Logan instructed him to keep the policy for him; that he (Logan) did not instruct him to return the policy; that subsequent to November 20th, when Stinson wrote to the First National Bank telling them to "hold the policy subject to Mr. Logan's call," he held the policy subject to Mr. Logan's call; that, had Logan called for the policy while it was in the bank subsequent to that date (November 20, 1893), he would have delivered it to him; that Logan made no objection to receiving the policy subsequent to the date witness received instructions from Stinson to hold the policy subject to his call; that, when he said that Logan desired to have the policy returned and his note delivered to him, he (witness) was referring to a time prior to November 20, 1893; that he thought he must have informed Logan that the policy was in his box after November 20, 1893, but that he had no dis-

tinct recollection as to the time, and thought so because it would have been their custom to do so. He further deposed as follows: "Q. Have you any distinct recollection that you are willing to say certainly that you notified him that you had placed the policy with his papers? A. I don't remember distinctly of notifying him at that time. Q. You can't say whether you did or not? A. Only it being in the line of my duty to do so. Q. It was your custom to do so? A. Yes, sir. Q. But you knew there had been a refusal on Mr. Logan's part to accept this policy before that because he could not pay this note? A. That was the only reason he ever gave. Q. You knew the fact that he refused to take the policy, didn't you? A. I knew that he could not take it under the circumstances. Q. Well, you knew that he had declined to accept the policy, and wanted you to return it? A. On the ground I have stated. Q. You knew that. Now, knowing that fact, did he ever change his mind or instructions to you in reference to that policy to your knowledge? A. No." The witness further testified, substantially as follows: That before writing the letter of November 1, 1893, he conferred with Logan in reference to the payment of the note and the delivery of the policy, and that said letter was written from what Logan told him; that before writing the letter of November 14, 1893, he also conferred with Logan in reference to the note and policy, and that said letter was also written from what Logan told him; that he had only one conversation with Logan up to that time; that the letter of November 1, 1893, was written shortly after said conversation, and that of November 14, 1893, was also based on said conversation; that no person was present at the conversation; that he thought that after receiving the letter of date November 6, 1893, he must have communicated to Logan the offer of Stinson that, if he could pay half of the face of the note, he might have time on the balance; that Logan did nothing in relation thereto; that he does not remember what Logan said in reference thereto; that Logan did not show him a letter he had received from Stinson bearing the same date, with reference to this matter; that he (witness) never saw such letter. The witness further testified that about March 29, 1894, he received a letter of date March 24, 1894, from W. S. Pond, inclosing an order from F. L. Stinson, dated March 14, 1894, both addressed to the First National Bank of Prineville, Or., and that he acted upon the said order and letter, by returning, on March 29, 1894, the policy to W. S. Pond, Seattle, Wash.; that he did not remember notifying Logan that the policy was to be returned; Logan never told him to return the policy; was an intimate friend and intimate business acquaintance of Logan for many years; does not remember that he notified Logan that the parties had requested a return of the policy; Logan had not called for the policy, and he (witness) wanted to see him get his note back; that he took the liberty to return the policy; that he felt authorized to return the policy from what he knew of Logan's wishes in the matter; that he does not remember that he communicated with Logan after returning the policy as to his having done so; does not remember having told him that he returned it. He further testified that he did not notify Stinson that he had placed the policy among or with Logan's papers, and that Stinson did not know the fact, nor did Logan; that he put the policy in the note case for the first time after he received the letter advising him to hold it subject to Logan's call.

F. L. Stinson testified that he was the state general agent of the Mutual Life Insurance Company of New York for Washington and Oregon; that his head office was at Seattle; that the company knew of this designation; that his letter heads sent to him by the company indicated that he was general agent for the states of Washington and Oregon; that his duties were to solicit applications for insurance, to collect premiums, and to deliver policies, remitting the premiums to the company; that, as such agent, it had been his custom to receive notes in payment of policies in lieu of money; that he had upon one or two different occasions told a Mr. Forbes, the general agent of the company for the Pacific Coast, that he had taken a great many notes in payment of premiums; that Mr. Forbes advised him not to take too many notes; that he should be careful in taking notes; that it had been his custom to deliver policies prior to the payment of the notes in many cases. The witness further stated that he remembered receiving an application for a policy in this company from Logan, and that he received the same from William Johnson, the

87 F.—41

agent; that he received at the same time the promissory note; that, after receiving the application and the note, he took a copy of the application, and sent the original to A. B. Forbes & Son; that the application was accepted by the company; that he received from the company a policy in accordance with the requirements of the application; that he sent the policy and note to the First National at Prineville, Or.; that the National Bank of Commerce of Seattle got the note from him, he having sold it to that bank for certain indebtedness due by him to the bank; that the note was taken as collateral security; that he had told Mr. Forbes, upon one occasion, of the fact that he had sold this note to the National Bank of Commerce; that, when he took the note from Logan, he took it as payment for the premium; that he never advised Mr. Logan or consented to return to Mr. Logan his note in accordance with the wishes purported to have been expressed by the latter as contained in the letter of Mr. Baldwin of November 1, 1893; that he told Mr. Forbes, upon the occasion of the latter's visit to Seattle about the last of November, 1893, that he had sold the note to the National Bank of Commerce; that Mr. Forbes asked him regarding the payment on the Logan policy, and that he told about the note, and where it was, and that he told him, further, that he (the witness) could not get the note without paying for it; that it was in the bank, and he (witness) could not get it without paying at least one-half of the note; that Mr. Forbes said he would look into the matter, and see what could be done; that he (witness) thought this conversation occurred in November, 1893, but he would not be positive; that, before writing the letter to the Prineville Bank wherein he told Mr. Baldwin to hold the policy subject to Mr. Logan's call, he had investigated the personal responsibility of Thomas J. Logan, the maker of the note, and had found it good; that, at the time he took the note, it was received by him in payment of the premium; that the policy had not then been received; that the note was to mature November, 1893, and he intended that the policy should be tendered at the time the note matured; that he did not intend that the policy should be delivered to Mr. Logan before the payment of the note; that he could not say that he did not intend at any time to deliver the policy until after he had collected the money that was due upon the note; that he does not remember ever having seen the rules and regulations issued by the company; that he did not think he received a printed copy of the rules and regulations, edition of March, 1893, from Mr. Forbes, governing him in his business, and did not have any printed instructions at all; that he did not know that, as an agent, he was expressly prohibited from receiving notes as payment for premiums.

A. B. Forbes, whose deposition was taken on behalf of the plaintiff in error, testified that he was the general agent of the company for the states of California, Nevada, Oregon, Washington, and other Pacific states and territories; that F. L. Stinson was his subagent, with limited powers; that he does not know why the policy to Logan was never delivered, if it was not delivered. except from correspondence about the policy after it was sent to Stinson; that in the latter part of 1893 he visited Seattle, and was then told by Mr. Stinson that delivery had not been made because Mr. Logan had not paid the premium; that he then told Stinson that a re-examination must be had, and the premium paid, before the delivery of the policy, and that he must give it immediate attention; that nothing was then said by Stinson to witness about any note made by Mr. Logan being hypothecated in any bank, nor did the witness know of the fact; that he did not recollect any conversation with Stinson about the particular note of Thomas J. Logan for $1,185, payable to his own order. The witness further testified, and produced and made a part of his deposition a pamphlet book, entitled, "Suggestions for the Guidance and Instruction of Local Agents and Solicitors, Edition of March, 1893, Published for the Mutual Life Insurance Company of New York"; that Stinson had a copy of such pamphlet book of rules; that among such rules was the following: "Agents are expressly prohibited from receiving notes as payment for premiums." The witness further testified that he had no knowledge of the taking of promissory notes for the payment of premiums by soliciting agents of F. L. Stinson or by F. L. Stinson, and that, after 60 days from the date of the policy, a re-examination of the applicant was required, and the premium was required to be paid before the policy was delivered; that Stinson was not a general agent; that he was a sub-

agent, he (witness) being the general agent for the company on the Coast; that Stinson held himself out as general agent, with the knowledge of witness; that he was in the employ of witness; that he had no doubt that Stinson represented himself as general agent of the company.

The plaintiff, Lysander S. Logan, son of the deceased, Thomas J. Logan, and defendant in error here, testified, over the objection of plaintiff in error, that he had a conversation with his father about the 1st of December,—the early part of December,—regarding the note and policy; that his father told him he had given his note for the premium on the policy, and that it was in the hands of attorneys, and he wanted to know if he (witness) could raise the money for him to lift the note; and that he (witness) told him that he could not at that time; and that his father then said, " 'I believe I will go to the bank and get the policy, and see if I can mortgage it for the money to pay the note,'— mortgage it to parties there, to see if he could get the money to lift his note with."

It is unnecessary to refer further to evidence in the case, as that already stated presents, for the most part, the only question at issue, viz. whether the contract of insurance was consummated on November 20, 1893.

Fenton, Bronaugh & Muir, for plaintiff in error.

Allen & Allen and John H. Powell, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The assignments of error are 32 in number. The errors claimed relate to admission and rejection of evidence, refusal to instruct the jury to bring in a verdict for the defendant, refusal to charge the jury as requested by plaintiff in error, defendant in the court below, and exceptions taken to certain parts of the charge as given. It will be necessary to consider first the alleged errors in admitting or rejecting evidence. If the court below committed a material error either in the admission or rejection of evidence, it follows that the judgment must be reversed, and a new trial ordered.

One of the assignments of error raises the question whether or not the court erred in permitting the witness Lysander S. Logan, the plaintiff in the court below, to answer the following question: "Q. Now, Mr. Logan, did you, subsequent to November, 1893, and, if so, when, have a conversation with Mr. Thomas J. Logan regarding this policy and this note?" To which the witness answered as follows: "A. I had a conversation with my father about the first of December, the early part of December, regarding the note and policy. He told me that he had given his note for the premium on this policy, and it was in the hands of attorneys, and he wanted to know if I could raise the money for him to lift his note; and I told him I could not at that time, and he says, 'I believe I will go to the bank, and get the policy. and see if I can mortgage it for the money to pay the note,'—mortgage it to parties there, to see if he could get the money to lift his note with." In the offer to prove this conversation, the following colloquy occurred between counsel and court. Counsel for defendant in error said: "I desire to prove by this witness that Thomas J. Logan stated to him that he knew that the policy was in the bank, and that he could go and get it whenever he wanted it. That was subsequent to November 20, 1893, in the early part of December, 1893, and Thomas

J. Logan did say that he was going to try to get it. I offer to prove that Thomas J. Logan told this witness that the policy was there; that he could go there, and get it; that the attorney was after him for this note; that he was going to go to one Maley, and borrow the money if he could; if Maley would lend him the money, he was going to mortgage the policy to Maley to secure payment." Whereupon the court said: "Have you examined to see whether this kind of testimony was admissible under any circumstances?" Whereupon counsel for plaintiff said: "I took it for granted it was, if your honor pleases." To which the court replied: "If it is a part of the transaction, it is entitled to come in. I think this testimony had better come in subject to your objection, giving counsel and myself an opportunity to consider the question at a later date in the course of the trial." Whereupon counsel for the defendant inquired: "You mean both conversations?" To which the court replied: "No; I am not speaking of the other conversation. I am quite clear as to the other conversation, but as to this transaction, this matter, that seems to be in the nature of an act endeavoring to borrow money." Whereupon counsel for defendant excepted, on the ground that it was incompetent and immaterial. The court then said: "I will allow this testimony subject to the objection. I will endeavor to give the jury such directions as I think the case warrants." As stated above, it does not appear that the court, in its instructions to the jury, again referred to this matter.

We are of the opinion that the admission of this testimony as to the conversation the witness had had with his father at a time subsequent to November 20, 1893, when the alleged delivery of the policy took place, was incompetent and self-serving testimony to show that Thomas J. Logan had accepted and thereby completed the delivery of the policy. In the first place, it was clearly hearsay testimony. The only way in which such testimony would have been admissible, the declarant being dead, was a declaration against interest. But it does not appear to have been offered as such, although the claim is not made that it would have been competent for that purpose. The conversation cannot, however, be regarded as constituting a declaration against interest, for it was plainly intended as, and its inevitable effect was that of, self-serving testimony. It is contended that it was, substantially, a declaration against interest, because Logan admitted his liability upon the note, by endeavoring to raise funds to pay it; but it must be observed that, while the statements indicating an admission of liability upon the note would have been properly admissible in an action on the note against Logan or his estate, the present suit is not brought to enforce a liability against him on the note, but is brought by his executor, who is also one of his heirs and legatees under the will, to enforce a liability against the company upon the policy, in which one of the chief questions of fact for the determination of the jury is whether or not the policy was delivered to, and accepted by, Thomas J. Logan. The court below, however, evidently considered it as part of the res gestæ, and admitted it as

such. But it is difficult to see how this conversation could be admitted as a part of the res gestæ. It took place, according to the witness, about the first part of December, 1893, although the witness does not remember exactly when it occurred. This was at least some 10 days after November 20, 1893, when the alleged delivery of the policy took place. A declaration, to be admissible as part of the res gestæ, must be contemporaneous with it, and so limit, explain, or characterize the fact it assists to constitute as to be in a just sense a part of it, and necessary to its complete understanding. 1 Greenl. Ev. § 110; Whart. Ev. § 259. That the conversation held between Logan, the plaintiff in the court below, and his father, and the statements made by the father in the course of such conversation, are not necessary incidents of the litigated act,—that is, whether the contract of insurance was consummated by a delivery of the policy on November 20, 1893,—is too clear for argument. The admission of this testimony must have had some effect on the jury, and, in our opinion, was material error.

The next question for our consideration is whether the court below erred in refusing to instruct the jury to bring in a verdict in favor of the defendant, plaintiff in error here. This alleged error is covered by assignment No. 1. As stated, the only issue in the case was whether the contract of insurance had been consummated. Three questions of fact may be said to arise under this issue: (1) Did Stinson have the authority to take a note in payment of the premium for the policy? (2) Did he, in fact, take the note in payment of the premium? (3) Was there a delivery of the policy to Logan? So far as these questions involve matters of fact, it was, undoubtedly, for the jury to determine them. Smith v. Assurance Soc., 13 C. C. A. 284, 65 Fed. 765. Their verdict, subject to the law as given by the court, is conclusive on this court, especially as the evidence may be said to be contradictory and conflicting. We think there was sufficient evidence to go to the jury, even excluding the evidence which we think the court below improperly admitted. It may not be of the strongest and most satisfactory character, but still it was sufficient to justify the jury in passing its judgment thereon. Upon the question of delivery, the case depended very much upon the credence given by the jury to the testimony of Baldwin, the cashier of the First National Bank of Prineville, Or., and an intimate friend of the deceased Logan.

Upon the question of law whether or not the taking of a note constitutes a payment, it is well settled by the weight of authority that an agent of a life company, who is intrusted with the business of closing the contract by delivering the policy, has an implied authority to determine how the premium then due shall be paid, whether in cash, or, as is sometimes done, by giving credit, in which case the agent becomes the creditor of the insured, and the debtor of the insurer. In that event, though the agent should subsequently default, and the premium should never reach the company, the policy would still be binding. Richards, Ins. (2d Ed.) § 93; Miller v. Insurance Co., 12 Wall. 285; Ball & S. Wagon Co. v. Aurora F. & M. Ins. Co., 20 Fed. 235; Smith v. Assurance Soc., 13

C. C. A. 284, 65 Fed. 765. The authorities cited by plaintiff in error are not inconsistent with this rule. While the rule itself is well settled, still an agent must have the authority, either actual or apparent, to take notes in payment of premiums, or the course of business of the company must be such as to warrant an implication of authority. Insurance Co. v. Willets, 24 Mich. 268. Whether or not Stinson possessed this authority, either actually or ostensibly, was, as has been stated, a question of fact. It appeared, on the one hand, that Stinson had made it a practice of taking notes in payment of premiums, and that the general agents knew this; that they acquiesced in this method of receiving payment, making no serious objection beyond admonishing Stinson to be cautious, as he might involve himself too heavily. On the other hand, Mr. Forbes, one of the general agents, directly contradicted this evidence. It was for the jury to pass upon this conflicting evidence.

It is, however, further contended that Stinson was prohibited by a rule of the company from taking notes. Stinson, in his testimony, made some claim that he was not aware of such a rule; but, however that may be, assuming for the purposes of the case that he did not know of the rule, the fact remains that there was evidence tending to show that the company knew of his frequent violations of the rule, and that it made no objection thereto, beyond advising Stinson to be cautious, as he might involve himself too heavily. It is not claimed that the insured knew of this rule. He cannot be prejudiced in his rights by the failure of Stinson, on the one hand, to observe a rule of the company, and of the company, on the other hand, to enforce the rule. It must be deemed that the company, through its general agent, waived the application of the rule in this case. Insurance Co. v. Norton, 96 U. S. 234; Insurance Co. v. Carder, 42 U. S. App. 659, 665, 27 C. C. A. 344, and 82 Fed. 986.

We now come to consider the charge of the court to the jury, and its refusal to charge as requested by the plaintiff in error. The court refused to give the following instruction:

"The fact, if it be a fact, that plaintiff, as executor of the estate of T. J. Logan, may have allowed the note as a claim against the estate, and in favor of the National Bank of Commerce, cannot be considered by you. Such action by the executor, if taken, cannot bind the insurance company or add anything to the rights of the plaintiff in this case."

This, in our opinion, was error. The only issue before the jury was whether or not the contract of insurance was consummated on November 20, 1893. The mere fact that, long subsequent thereto, the note was allowed as a claim against the estate, cannot be deemed to bind the plaintiff in error in any way, the note not having been presented on behalf of the insurance company. If the contract of insurance was never consummated, if Logan never accepted the policy, the fact that the note, which at the outset he had given to Stinson, was allowed as a claim against his estate, cannot bind the insurance company, nor add anything to the rights of the plaintiff. We think that the instruction requested should have been given, in view of the evidence presented in the case.

**The court, in its charge, instructed the jury as follows:**

"Now, in determining what was done, or what Logan said or did, you must take the testimony of witnesses as to what Logan did or said, and not consider the statements contained in the letters that passed from Baldwin to Stinson."

**In objecting to this instruction, the following colloquy occurred between the court and counsel for the plaintiff in error:**

"Judge McArthur: We also except to your honor's instruction to the jury that the statements in the letters are not to be considered by them as evidence. The letters of Baldwin to Stinson are not to be considered as evidence in the case."

**Whereupon the court, in response to said objection, and before the jury retired, said:**

"I do not wish to be understood in that way. I say the statements in the letters of Baldwin to Stinson as to what Logan did are not to be considered, but, instead, Baldwin's testimony as to what Logan did and said; that they may consider that rather than the statements of Baldwin in his letters as to what Logan said."

**Whereupon counsel for defendant replied to the court, in the presence of the jury:**

"Yes, I understand the court to draw the distinction between the statement in the letter and the statement under oath as evidence; but we consider that the statement in the letter is simply a verbal act, and is the best evidence of what was done, coming so recently after the statements said to have been made by Logan, and are receivable in evidence, and should have full force and effect as a verbal act."

This part of the charge was clearly error. The jury were told, in effect, that they should consider the testimony of Baldwin in preference to the statements made by him, and contained in his letters to Stinson. But it was for the jury to say which of the statements they preferred to accept. It was for them to pass upon the credibility of Baldwin's testimony. They might have considered that the statements contained in his letters to Stinson written at the time were preferable and more truthful than his subsequent testimony. The significance of this is seen in the fact that in the letters Baldwin stated that Logan refused to take the policy, while in his testimony he swore that Logan never absolutely refused to take the policy, and that, furthermore, he never directed him (Baldwin) to return the policy. This variance was matter for the jury to consider and judge. It may be that the learned judge felt justified in believing that the testimony of Baldwin was entitled to more credence than the statements contained in his letters to Stinson; but the instruction was couched in such language that it may well be that the jury considered they were bound to give more weight to Baldwin's testimony than to his statements in the letters. The court should have been careful to distinguish the law from the facts. See Starr v. U. S., 153 U. S. 614, 14 Sup. Ct. 919.

The remaining assignments of error do not, in our opinion, show any error committed by the court in its other instructions to the jury. For the reasons stated above, the judgment will be reversed, and the cause remanded for a new trial.