McKNIGHT et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1904.)

No. 1,036.

1. INDIANS—ACTION BY UNITED STATES TO PROTECT RIGHTS—CATTLE ISSUED FOR STOCKRAISING PURPOSES.

Under the act of Congress ratifying agreements made with Indian tribes in Montana, including the Blackfeet, which provide, inter alia, for the issuance of cattle to such Indians for stockraising purposes, and that all such cattle and their increase shall bear the brand of the Indian Department, and shall not be sold, exchanged, or slaughtered, except by consent of the agent in charge, an Indian to whom such cattle are issued acquires only a conditional ownership for the purposes stated in the act, and it is the right and duty of the United States to protect such ownership, for which purpose it may maintain an action in a federal court in behalf of an Indian from whom cattle so issued have been unlawfully taken; and such right is not affected by the fact that an Indian in whose behalf such an action is brought is a woman who is married to a white man, and has thereby become a citizen of the United States, but who remains on the reservation with her tribe—it being expressly provided by Act Aug. 9, 1888, c. 818, 25 Stat. 392, 1 Supp. Rev. St. p. 608, that such marriage and citizenship shall not "impair or in any way affect the right or title of such married woman to any tribal property or interest therein."

2. UNITED STATES—ACTION BY—EFFECT OF STATE STATUTES.

The right of the United States to maintain an action in respect to a governmental matter cannot be affected by a state enactment requiring a notice to be given or demand made as a condition precedent to suit.

3. SHERIFFS—LEVY OF ATTACHMENT—SEIZING PROPERTY OF THIRD PERSON.

A sheriff is not protected in levying an attachment against a man on cattle owned by his Indian wife residing on a reservation, which cattle she could not lawfully dispose of, except with the consent of the Indian agent, and which, as required by law, bore the brand of the Indian Department, as well as her own brand, which was different from that of her husband; and it is immaterial that they were in the possession of the husband, or with cattle owned by him—the brands being sufficient to put him on inquiry as to the ownership.

4. CONFUSION OF GOODS—APPLICATION OF DOCTRINE—CATTLE.

The doctrine of confusion of goods has no application to cattle or horses, or other property of similar nature, that can be readily identified.

5. CONVERSION—EVIDENCE OF OWNERSHIP—DECLARATIONS OF PERSON IN POSSESSION.

In an action against a sheriff and an attaching creditor for conversion of property of the debtor's wife by its seizure and sale under the attachment, declarations of the husband to the creditor that the property was in his possession and that he was the owner are not admissible to prove his ownership as against plaintiff, especially where such declarations were made prior to the suit, and were therefore not a part of the res gestæ.

6. SAME—ACTION BY UNITED STATES.

In an action by the United States, as guardian of an Indian woman, for the conversion by defendant of cattle issued to her by the government for stockraising purposes, and which she had no power to dispose of, declarations by her as to the ownership of the cattle are inadmissible against the plaintiff.

7. SAME—DECLARATIONS OF OFFICER IN MAKING LEVY.

Declarations of an officer, in making a levy, going to show his knowledge that the property levied on was owned by a third person, or that he was put on inquiry as to such ownership, are admissible in an action in behalf of such third person for the conversion.

8. TRIAL—SEPARATION OF JURY—ADMONITION.

The failure of the court, on the separation of the jury for a noon recess during a trial, to admonish them against conversing about the case or forming an opinion thereon, as required by a statutory provision, is not a material error, where the admonition had been given on their previous separations during the same trial.

9. SAME—REMARKS OF COURT TO JURY—HARMLESS ERROR.

Remarks of the court in its charge to the jury with respect to the conduct of the case by counsel *held*, while improper, not to have constituted prejudicial error.

In Error to the District Court of the United States for the District of Montana.

McConnell & McConnell, for plaintiffs in error.
Carl Rasch, U. S. Atty.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This action was brought by the United States, as guardian of Josephine Hall, an Indian woman, for the conversion by the defendants to the action of 34 head of cattle, alleged

to have been owned, held, and possessed by this Indian, subject to the control of the government, and of the value of $1,125. The answer of the defendants put in issue the averments of the complaint, and also alleged in defense that the defendant Taylor is, and was at the times in question, the duly elected, qualified, and acting sheriff of the county of Teton, state of Montana; that on the 25th day of September, 1901, one John Hall was, and from thenceforth until November 9, 1901, remained, the sole owner of the cattle mentioned in the complaint; that thereafter, to wit, on the 25th day of September, 1901, an action was commenced by the defendant McKnight against John Hall in the district court of the Eleventh judicial district of the state of Montana, in and for the county of Teton, to recover the sum of $603.72, with interest thereon at the rate of 1 per cent. per month from May 8, 1900, with attorney's fees and costs of suit, according to the terms of a certain promissory note of said Hall; that process was duly issued and served upon Hall in that action, and on September 25, 1901, a writ of attachment was regularly issued therein in due form, which writ of attachment was placed in the hands of the defendant Taylor, as sheriff of the county, with instructions to levy the same upon the cattle mentioned in the complaint, which was accordingly done; that on the 25th day of October, 1901, judgment was duly entered in the action of McKnight against John Hall for the sum of $762.65, upon which execution was duly issued in due form, under which the cattle in question were sold for the sum of $1,247 on November 12, 1901; and that John Hall was the owner of and in possession of the cattle at the time of the levy. These averments of the answer were put in issue by the replication filed by the plaintiff. The case came on for trial before the court with a jury, and resulted in a verdict and judgment for the plaintiff, and is brought here by the defendants below on writ of error.

The first, and principal, contention on the part of the plaintiffs in error is that the court below was without jurisdiction of the subject-matter of the action, "for the reason that Josephine Hall is a citizen of the United States, and this action is between citizens of the same state, and the amount involved does not exceed $2,000, and the United States is not a proper party plaintiff in this action." The case shows that some years prior to the transactions in question Josephine Hall married John Hall, who was a white man and a citizen of the United States. Josephine Hall was a member of the Blackfeet tribe of Indians, and as a matter of fact lived upon its reservation and received from the government, through its agent there, issues of cattle and other things, like the other Indians of the tribe. John Hall entered upon a piece of public land, situated across a creek that separated such public land from the Indian reservation, and entered that piece of land as a homestead, and claimed his residence thereon, which was but a short distance from the house in which his Indian wife actually lived, and where he visited her, as she also did him, occasionally.

The act of Congress of February 8, 1887, entitled "An act to provide for the allotment of lands in severalty to Indians on the various

reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes" (24 Stat. 388, c. 119, 1 Supp. Rev. St. pp. 534, 536), provided in its sixth section as follows:

"Sec. 6. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up, within said limits, his residence separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property."

The first and second sections of Act Aug. 9, 1888, c. 818, 25 Stat. 392, 1 Supp. Rev. St. p. 608, entitled "An act in relation to marriage between white men and Indian women," are as follows:

"Be it enacted," etc., "that no white man, not otherwise a member of any tribe of Indians, who may hereafter marry an Indian woman, member of any Indian tribe in the United States, or any of its territories except the five civilized tribes in the Indian Territory, shall by such marriage hereafter acquire any right to any tribal property, privilege, or interest whatever to which any member of such tribe is entitled.

"Sec. 2. That every Indian woman, member of any such tribe of Indians, who may hereafter be married to any citizen of the United States, is hereby declared to become by such marriage a citizen of the United States, with all the rights, privileges, and immunities of any such citizen, being a married woman: Provided, that nothing in this act contained shall impair or in any way affect the right or title of such married woman to any tribal property or any interest therein."

It has been held by this court, by the Circuit Court of Appeals for the Eighth Circuit, by the Supreme Court, and by other courts, that the citizenship conferred upon the allottees under and by virtue of the act of February 8, 1887, did not operate to withdraw them from the supervision, control, and protection of the government, but that such Indians still remained wards of the nation. United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; Farrell v. United States, 110 Fed. 942, 49 C. C. A. 183; Eells v. Ross, 64 Fed. 417, 12 C. C. A. 205; United States v. Logan (C. C.) 105 Fed. 240; United States v. Flournoy Live Stock & Real Estate Co. (C. C.) 69 Fed. 886; State v. Columbia George (Or.) 65 Pac. 604, 610. In and by its act of August 9, 1888, declaring that every Indian woman, member of a tribe, who shall thereafter be married to a citizen of the United States, shall "become by such marriage a citizen of the United States, with all the rights, privileges, and immunities of any such citizen," Congress expressly added that nothing in the act contained "shall impair or in any way affect the right or title of such married woman to any tribal property or interest therein."

By Act May 1, 1888, entitled "An act to ratify and confirm an agreement with the Gros Ventre, Piegan, Blood, Blackfeet, and River Crow Indians in Montana, and for other purposes," the United States, in consideration of certain cessions and relinquishments on the part of those Indians, agreed—

"To advance and expend annually for the period of ten years after the ratification of this agreement, under direction of the Secretary of the Interior, for the Indians now attached to and receiving rations at the Fort Peck agency, one hundred and sixty-five thousand dollars; for the Indians now attached to and receiving rations at the Fort Belknap agency, one hundred and fifteen thousand dollars, and for the Indians now attached to and receiving rations at the Blackfeet agency, one hundred and fifty thousand dollars, in the purchase of cows, bulls, and other stock, goods, clothing, subsistence, agricultural and mechanical implements, in providing employees, in the education of Indian children, procuring medicine and medical attendance, in the care and support of the aged, sick, and infirm, and helpless orphans of said Indians,. in the erection of such new agency and school buildings, mills, and blacksmith, carpenter, and wagon shops as may be necessary, in assisting the Indians to build houses and inclose their farms, and in any other respect to promote their civilization, comfort, and improvement: Provided, that in the employment of farmers, artisans, and laborers, preference shall in all cases be given to Indians residing on the reservation who are well qualified for such positions: Provided further, that all cattle issued to said Indians for stock-raising purposes, and their progeny, shall bear the brand of the Indian Department, and shall not be sold, exchanged, or slaughtered, except by consent or order of the agent in charge, until such time as this restriction shall be removed by the Commissioner of Indian Affairs." 25 Stat. 114, c. 213, art. 3.

And article 5 of the same act is as follows:

"In order to encourage habits of industry, and reward labor, it is further understood and agreed, that in the giving out or distribution of cattle or other stock, goods, clothing, subsistence, and agricultural implements, as provided for in article 3, preference shall be given to Indians who endeavor by honest labor to support themselves, and especially to those who in good faith undertake the cultivation of the soil, or engage in pastoral pursuits, as a means of obtaining a livelihood, and the distribution of these benefits shall be made from time to time, as shall best promote the objects specified."

By article 3 of the agreement with the Indians of the Blackfeet Indian reservation in Montana, of date September 26, 1895, it was agreed:

"That in the employment of all agency and school employees, preference in all cases be given to Indians residing on the reservation, who are well qualified for such positions; and that all cattle issued to said Indians for stock-raising purposes, and their progeny, shall bear the brand of the Indian Department, and shall not be sold, exchanged, or slaughtered except by the consent of the agent in charge until such time as this restriction shall be removed by the Commissioner of Indian Affairs." Act June 10, 1896, c. 398, 29 Stat. 355.

By Act July 4, 1884, c. 180, par. 3, 23 Stat. 76, 1 Supp. Rev. St. p. 450, it was provided:

"That where Indians are in possession or control of cattle or their increase, which have been purchased by the government, such cattle shall not be sold to any person not a member of the tribe to which the owners of the cattle belong, or to any citizen of the United States, whether intermarried with the Indians or not, except with the consent, in writing, of the agent of the tribe to which the owner or possessor of the cattle belongs. And all sales made in violation of this provision shall be void, and the offending purchaser on

conviction thereof shall be fined not less than five hundred dollars, and imprisoned not less than six months."

By Act June 7, 1897, c. 3, 30 Stat. 62, 90, it is provided:

"That all children born of a marriage heretofore solemnized between a white man and an Indian woman by blood and not by adoption, where said Indian woman is at this time or was at the time of her death recognized by the tribe, shall have the same ·rights and privileges to the property of the tribe to which the mother belongs or belonged at the time of her death, by blood, as any other member of the tribe, and no prior act of Congress shall be construed as to debar such child of such right."

Sections 2127 and 2138 of the Revised Statutes are as follows:

"Sec. 2127. The agent of each tribe of Indians, lawfully residing in the Indian country, is authorized to sell for the benefit of such Indians any cattle, horses, or other live stock belonging to the Indians and not required for their use and subsistence, under such regulations as shall be established by the Secretary of the Interior. But no such sale shall be made so as to interfere with the execution of any order lawfully issued by the Secretary of War, connected with the movement or subsistence of troops. * * *"

"Sec. 2138. Every person who drives or removes, except by authority of an order lawfully issued by the Secretary of War, connected with the movement or subsistence of troops, any cattle, horses, or other stock from the Indian country for the purposes of trade or commerce, shall be punishable by imprisonment for not more than three years, or by a fine of not more than five thousand dollars, or both."

These agreements and statutory enactments very clearly show that cattle purchased by the government and issued to the Indians of a tribe are not theirs absolutely and unconditionally, but, as is expressly provided by law, are provided and issued for the purpose of promoting "their civilization and improvement," and to "encourage habits of industry" among them, the alienation and slaughtering of which cattle, without the consent of the government's agent in charge of the reservation, is expressly forbidden. The right and duty of the government to protect such conditional ownership of the Indians does not admit of doubt. United States v. Flournoy Live Stock & Real Estate Company (C. C.) 69 Fed. 886; Id. 71 Fed. 576; United States v. Mullin (D. C.) 71 Fed. 685; United States v. Winans (C. C.) 73 Fed. 72; Beck v. Real Estate Co., 65 Fed. 30, 12 C. C. A. 497; Truscott v. Hurlbut Land & Cattle Company, 73 Fed. 64, 19 C. C. A. 374, and cases supra.

The act conferring citizenship, with its accompanying rights, upon Indian women who marry white citizens of the United States, expressly declares, as has been seen, that nothing in the act "shall impair or in any way affect the right or title of such married woman to any tribal property or interest therein." The marriage of Josephine Hall to John Hall did not, therefore, extend her rights in the cattle in question, which remained precisely as they were before such marriage.

It is provided by a statute of Montana that:

"If personal property attached be claimed by a third person, he shall give notice thereof to the sheriff and deliver to him an affidavit stating his claim, ownership, and a description of the property, and unless the plaintiff within ten days after receiving notice thereof give the sheriff a good and sufficient bond to indemnify him against loss or damage by reason of retaining said property, the sheriff shall deliver the same to such person." Section 906, Code Civ. Proc. Mont:

And it is insisted on the part of the plaintiffs in error that, if the cattle in question were the property of Josephine Hall, the giving of the notice and the making of the affidavit provided for by this statute "is a condition precedent to Josephine Hall's right of action against the sheriff for the conversion of this property." A sufficient answer to this suggestion is that this action is brought by the United States, and that its rights in a governmental matter are not affected by state enactments. Pond et al. v. United States et al., 111 Fed. 989, 49 C. C. A. 582, and cases there cited. We need not, therefore, inquire whether or not section 906 of the Montana Code, concerning the claim and delivery of personal property, could operate to defeat an action for the conversion of such property, where no notice or demand prior to the bringing of suit is alleged or shown.

Nor did the court below err, as is contended on behalf of the plaintiffs in error, in refusing to instruct the jury that, if the cattle in question were in the possession of John Hall when they were seized, the defendant Taylor would not be liable, unless Josephine Hall had designated the cattle belonging to her, and demanded their return, with which demand the sheriff refused to comply. It appears from the evidence, as has been said, that, notwithstanding her marriage to John Hall, Josephine Hall continued to actually reside on the reservation, and received from the government its regular issues of cattle and rations, along with the other Indians of the tribe. It further appears that prior to her receipt of any cattle from the government her father gave her three head, her uncle one, and her brothers four, making eight head in all, and that in the years 1895 and 1896 eleven head were issued to her by the government, and in 1901 seven head more. Rule 360 of the Regulations of the Indian Office provides as follows:

"When cattle are issued to Indians, either for work oxen or for breeding purposes, each animal must be branded, in addition to the I. D. brand, with a private mark to indicate the person to whom it is issued. A record of such private marks must be kept in the agency office. The agent is also required to see that the increase of all issued cattle is similarly branded." Regulations of the Indian Office, 1894, p. 76.

All of the cattle issued to Josephine Hall were, in accordance with the foregoing regulations of the Indian Department, branded with the letters "I. D." (indicating "Indian Department"), and it appears that a private brand, "B. E.," signifying "Beaver Eyes" (the Indian name of Josephine Hall), was selected by the agent of the reservation for her, and also placed upon the cattle issued to her. It further appears that in the year 1897 Josephine Hall purchased from one Gardiner a brand called the "Y. G." brand, and from that time on her cattle and the increase thereof were branded with the I. D. and the Y. G. brands. John Hall, it appears, was the owner of a brand spoken of in the record as the "Reel" brand, consisting of a cross with a "T" on each end of it; and he, also, had some cattle with his brand running on the reservation. It appears from the evidence that in making the levy the deputies of the defendant sheriff entered upon the reservation and there rounded up cattle that were herding together, including the cattle of Jose-

phine Hall, as well as some of John Hall. They also levied upon 19 head at the place of one Prendergast, most of which were branded with the I. D. and Y. G. brands, which had been driven there by John Hall en route to Browning for shipment to Chicago, provided (according to John Hall's testimony) a permit could be obtained from the Indian agent at Browning consenting to the shipment of Mrs. Hall's cattle. The evidence, however, is that Mrs. Hall did not authorize her husband to sell her cattle, and did not know that he had driven any of them away, for the purpose of shipment or otherwise.

The obvious duty of an officer in executing a writ of attachment is, as held by this court in St. Paul, etc., Railway Company v. Drake, 44 U. S. App. 271, 276, 72 Fed. 945, 19 C. C. A. 252, to levy upon property of the defendant to the writ, and not upon the property of somebody else. He has, as was said by the Supreme Court in Buck v. Colbath, 3 Wall. 334, 343, 18 L. Ed. 257—

"A very large and important field for the exercise of his judgment and discretion, first, in ascertaining that the property on which he proposes to levy is the property of the person against whom the writ is directed; secondly, that it is property which by law is subject to be taken under the writ; and, thirdly, as to the quantity of such property necessary to be seized in the case in hand. In all these particulars he is bound to exercise his own judgment, and is legally responsible to any person for the consequences of any error or mistake in its exercise to his prejudice. He is so liable to plaintiff, to defendant, or to any third person whom his erroneous action in the premises may injure."

Even if it be conceded that the different brands upon these cattle were not of themselves enough to put the officer upon inquiry as to their ownership, it appears from the testimony of the deputy sheriff who made the levy that he had sufficient knowledge of a controversy to put him upon inquiry as to the ownership; his testimony upon redirect examination being:

"I was directed specifically and positively to take all the Y. G. cattle. Those were Mrs. Hall's cattle, or considered as hers in the neighborhood, from rumor."

The doctrine relating to "confusion of goods," relied on by counsel for the plaintiffs in error, has no application to cattle and horses, and things of a similar nature, that may be readily identified. The Idaho, 93 U. S. 575, 23 L. Ed. 978; Claflin v. Beaver (C. C.) 55 Fed. 576; Carlton v. Davis, 8 Allen (Mass.) 94; Moore v. Bowman, 47 N. H. 494, 502; Capron v. Porter, 43 Conn. 383; Brown v. Bacon, 63 Tex. 595; Drake on Attachment (7th Ed.) § 199.

In the course of the trial the defendant McKnight testified, in effect, that prior to the commencement of his action against John Hall he went to the ranch of the latter for the purpose of collecting his note, and that Hall there said to him, "I have got the cattle all rounded up and intend to ship them to Chicago from Baltic in a few days," but that he (McKnight) replied that it would be more satisfactory to him for Hall to settle the note before he shipped the cattle; that Hall said:

"All right; I will come in and square this. I will pay you this as I can get the money from Kingsbury and Davies."

An objection and motion to strike this testimony out having been made, the court said:

"Do you expect to prove that he had these cattle and owned them? If so, you must prove it by something more than John Hall's declaration."

To which counsel for the defendants responded:

"We do, and we expect to offer to prove by this witness that John Hall was the owner of the cattle whose conversion is now being sued for; that he was in possession of them, and about to ship them to Chicago, and while exercising acts of ownership and control over these very cattle he offered to mortgage them to McKnight to secure his debt to him, or, if McKnight would wait until he shipped them to Chicago, he would turn over the proceeds of the sale of them to McKnight, and stated to McKnight that the cattle were his. This offer of proof is made for the purpose of showing that the cattle belonged to John Hall, and also for the purpose of impeaching Hall as a witness. (Motion to strike [out] granted, and offer of proof denied by the court. The defendants excepted.)"

It is insisted on the part of the plaintiffs in error that such declarations of John Hall in respect to the ownership of the cattle were admissible. We do not think so. Conceding, but without holding, that the declarations of one in possession of personal property, in respect to the character of such possession, are admissible in evidence against strangers on the issue of ownership, yet an insuperable objection to the proposed declarations in the present case is that they were not made at a time when they could be properly regarded as a part of the res gestæ. Mutual Life Insurance Company v. Logan, 87 Fed. 637, 645, 31 C. C. A. 172; Mack v. Porter, 72 Fed. 236, 242, 18 C. C. A. 527; Crawford v. Crawford (Kan. Sup.) 55 Pac. 842; Low v. Schaffer (Or.) 33 Pac. 679; Alexander v. Jennings, 78 Tenn. 419; Coxe v. Milbrath, 110 Wis. 499, 86 N. W. 174; 1 Greenleaf on Evidence, § 110; Wharton on Evidence, § 259; 24 A. & E. Encyc. of Law (2d Ed.) p. 691.

It is further contended on the part of the plaintiffs in error that the court below erred in sustaining objections to questions to Josephine Hall by which it was sought to show that she had told the defendant McKnight in 1897 that the cattle issued to her by the government had been taken by people to whom she was indebted, and in sustaining like objections to a question put to the witness McKnight. The ruling of the court below was right. These cattle, like the personal property spoken of by the Supreme Court in United States v. Rickert, 188 U. S. 432, 443, 23 Sup. Ct. 478, 483, 47 L. Ed. 532, were purchased with the money of the government and were furnished to the Indians "to induce them to adopt the habits of civilized life. It was, in fact, the property of the United States, and was put into the hands of the Indians to be used in execution of the purpose of the government in reference to them." It is not pretended that the government ever consented to a disposition of the cattle by Josephine Hall, and it is plain that no declaration of hers could affect its right and duty to protect her.

It is also urged on behalf of the plaintiffs in error that the court below improperly permitted John Hall to give in evidence a conversation he had with the deputies of the defendant sheriff. Hall,

having testified that he had a conversation with them in respect to some of the cattle that they had levied upon and had in charge, was asked:

"What was said?"

To which he was permitted to answer, over the objection and exception of the defendants, as follows:

"A. I rode up to them. They had that little bunch of cattle and was driving them off. The undersheriff of Mr. Taylor said: 'We are coming to get the rest of them.' I said: 'What are you going to do with them?' 'Why,' he says,' 'we will sell them, I reckon, when we get around to it.' There must have been twenty head of I. D. cattle in that bunch."

The record proceeds:

"Q. Did you at that time say anything about the I. D. cattle that were in the bunch? (Objected to as leading, and as incompetent, irrelevant, and immaterial. Objection overruled. Defendants excepted.) A. I said: 'What are you going to do with the I. D. cattle?' He said: 'I don't know what they are going to do with them. Our orders are to take everything with the Y. G. brand on them, even if it had the I. D. on it.'"

Even if it be conceded that this testimony was improperly admitted, it was immaterial, for it in no way tended to prove the ownership of the cattle. It may be added, however, that declarations of an officer in making a levy, in connection with the performance of his acts, are admissible. 1 Wharton on Evidence, §§ 262, 264; 1 Greenleaf on Evidence, § 108; Steamboat Company v. Brockett, 121 U. S. 637, 7 Sup. Ct. 1039, 30 L. Ed. 1049.

In the cross-examination of John Hall, and of the deputy sheriff, Gaines, both of whom were witnesses for the plaintiff, the counsel for the defendants sought to show that the cattle of Josephine Hall and John Hall were intermingled, and that neither Hall nor his wife ever pointed out to the officer the cattle belonging to Mrs. Hall; the defendants contending that, under the circumstances, the officer could not become liable without being notified by or on the part of Mrs. Hall of her ownership. The record shows, on the re-direct examination of John Hall, the following proceedings:

"Q. Now, you say, when you met the deputy sheriffs there on the reservation with the cattle, that they knew that they were Y. G. and I. D. cattle, and that they belonged to your wife. How do you know that? (Objected to as incompetent, irrelevant, and immaterial. Objection overruled. Exception noted.) A. One of the deputies lives right there close to me. You might say he seen the cattle right along. He knew them as well as I did; knew what the brand was."

And on the redirect and recross-examination of the witness Gaines the following proceedings:

"Redirect examination: I also knew that the Y. G.'s was hers; but, irrespective of that, I was ordered to bring all of the Y. G. cattle with the I. D. brand on.

"Recross-examination: As to whether I knew that brand was hers, it was simply hearsay, and the general talk round about there. It is general repute and hearsay. I didn't see it recorded at all.

"(Counsel for defendants moved to strike out all of the testimony of this witness as to what he heard about the Y. G. brand being Josephine Hall's, because the same is hearsay, and incompetent, and not the proper way to prove ownership of a brand. Motion denied. Defendants excepted.)"

We think the testimony was admissible, not, as a matter of course, for the purpose of proving title, but as going to show that the officer was put upon inquiry as to the true ownership of the cattle in question.

Section 1082 of the Code of Civil Procedure of Montana provides that:

"If the jury are permitted to separate either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with or suffer themselves to be addressed by any other person on any subject of the trial, and that it is their duty not to form or express an opinion thereon until the case is finally submitted to them."

And it is contended on the part of the plaintiffs in error that by virtue of this state statute, and of the provisions of section 914 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 684], providing that the practice, pleadings, and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the Circuit and District Courts, shall conform, as near as may be, to the practice, pleadings, and forms and modes of proceeding in like causes in the courts of record of the state within which said Circuit or District Courts are held, the court below committed reversible error in allowing the jury to separate on one occasion during the trial without giving this statutory admonition. The record shows that twice upon the first day of the trial of the case, to wit, upon taking a recess at noon, and again upon the adjournment of the court for the day, the court below did duly admonish the jury in accordance with the provisions of the state statute cited. Upon taking the noon recess on the second day of the trial, the court neglected to give the admonition, to which, however, no exception was taken by the counsel for the defendants until the reassembling of the court at the afternoon session. Had the attention of the court been called to its omission in the matter by counsel, no doubt the admonition would have been given; and counsel's failure to note an exception at the time precludes their availing themselves of the omission, even if there were any merit in the contention; but the clear and explicit admonition given by the court below to the jury on two previous occasions was a substantial compliance with the statute, as has been frequently held. Gleason v. Strauss, 5 Kan. App. 80, 48 Pac. 881; Perkins v. Ermel, 2 Kan. 325; Kirby v. W. U. Tel. Co. (S. D.) 55 N. W. 759, 30 L. R. A. 612, 621, 46 Am. St. Rep. 776; Musselman v. Pratt, 44 Ind. 126; People v. Coyne, 116 Cal. 295, 48 Pac. 218; People v. Colmere, 23 Cal. 632.

During the trial of the cause, John Hall having testified that the papers in the attachment suit against him were served by one Link Hummell, after which the witness said something about going to a place called Dupuyer and settling the matter with McKnight, the following proceedings occurred:

"Q. Isn't it a fact that you went to Dupuyer with Link Hummell and during the night you left Dupuyer, went out where the cattle were, took possession of them again, and, instead of continuing on towards Baltic with them, you reversed the course in which you were taking them at the time of the attachment, and took them over to Slim Prendergast's place and secreted them

from the sheriff? By Mr. Rasch: Object to that as incompetent, irrelevant, and immaterial. By the Court: There is a great deal of this that is meant to create a feeling in this matter. Now, what effect would that have? By Mr. McConnell: We are attempting to show that these cattle belonged to John Hall, and that he exercised ownership and control over them. By the Court: No; you are attempting to show that this man did something wrong, and committed a theft. That's what you are."

And upon the conclusion of the instructions to the jury, to which counsel for the defendants entered a number of exceptions, as they had the undoubted right to do, these proceedings occurred:

"By the Court: There is one other thing I will state to the jury. (To Mr. McConnell) You may take an exception to this, too. I have not much patience with an attorney who comes into court and attempts to cast reproach upon some one who is here of a different race, which may be called an inferior race. There are people all over the country, that have Indian blood in their veins, that are respectable people. The present mayor of Chicago has Indian blood in his veins. Your Lieutenant Governor of Montana is a mixed-blood Indian, and his mother is a respectable woman. By Mr. McConnell: To those remarks of the court, may it please the court, we desire to enter an exception on behalf of the defendants. I have not attempted to cast any reproach upon an Indian. My criticisms were devoted exclusively to John Hall, who stated he was a white man, and your honor's remarks are highly prejudicial to the defendants' cause."

We have no means of verifying the assertion of counsel for the defendant in error that these remarks of the court were provoked by the argument of counsel for the plaintiffs in error. They were improper, and are much to be regretted. Nevertheless, as we are of the opinion that the instructions of the court properly stated to the jury the law, and covered the case presented, and as we are of the further opinion that a verdict in favor of the plaintiffs in error could not have been properly rendered in view of the evidence in the case, the improper remarks complained of could not have resulted in substantial injury.

The judgment is affirmed.