### UNITED STATES v. HEYFRON, County Treasurer.

(Circuit Court, D. Montana. April 24, 1905.)

No. 690.

INDIANS—ADOPTION OF HALF-BREED INTO TRIBE—TRIBAL RIGHTS.

The various acts of Congress relating to Indians, including those relating to the Flathead Indian Nation, as well as the practice of the executive departments of the government, recognize the right of a tribe to adopt as a member thereof an Indian of the half blood who has continued to reside on the reservation as an Indian, and one so adopted has all the rights of a tribal Indian and a ward of the United States, including the exemption from state taxation of his property held on the reservation, so long as his tribal relation continues.

In Equity. Suit for injunction.

Carl Rasch, U. S. Atty. (Marshall & Stiff, of counsel), for plaintiff. Woody & Woody, for defendant.

HUNT, District Judge. The United States brought this bill against the county treasurer of the county of Missoula, within the state of Montana, praying for a writ of injunction to restrain the said treasurer from enforcing the collection of certain taxes which he was seeking to collect from Michel Pablo. It is alleged that Pablo is an Indian person and a member of the Flathead Indian Nation, and was such during the year of 1903, when the defendant attempted to collect taxes; that, under the laws of the United States and the treaties heretofore entered into by the United States with the Flathead Indian Nation, the said Pablo became, and, as a member of the Flathead Indian Nation, is, a ward of the United States, and entitled to own and hold personal property on the said Indian reservation in his own right, free from taxation by the state and the county of Missoula. The answer denies that Pablo is an Indian or a member of the Flathead Nation, and denies that he is entitled to own and hold property on the Flathead Reservation exempt from taxation.

There is but one question presented by the pleadings, which is, was Michel Pablo a ward of the government of the United States, by reason of his being an Indian and maintaining tribal relations with certain Indian tribes? The facts are these: Michel Pablo was born about 58 or 60 years ago, east of the Rocky Mountains, in what is now known as part of the state of Montana, and which was at the time of his birth a section recognized as Indian country, occupied by Blackfeet Indians. His father was a Spaniard, and his mother a full-blood Piegan Indian. His father died when he was

young, and after the death of the father the boy accompanied his Indian mother to the Colville Reservation, in the territory of Washington. His mother died there, and he remained on the Colville Reservation until he was about 13, associating in his boyhood with Indian boys. Then he went to De Smet, Mont., which is now within Missoula county; and after staying there a short time he went to the Flathead Reservation, and has lived there ever since, or for about 42 or 43 years. About 4 years after he removed to the Flathead Reservation a council of Indian chiefs of the Indian tribes and Indians was called for the purpose of considering the question of the adoption of Pablo. This council was held in 1864. Pablo himself was present at the council. The chiefs announced his adoption after the council, and ever since that time he has been treated as a member of the tribe by the Indians themselves, and has complied with all the laws, rules, and regulations of the tribe. He married a member of the tribe, and has reared a family, and never has severed his tribal relations, but without interruption has maintained the habits and customs of the Indians. The government of the United States has made no difference in its treatment of Pablo from that accorded to Indians of the tribe, and Pablo has participated and acted with the tribes and nations in tribal affairs and councils and otherwise. His name appears upon the official roll and the annuity roll of the government of the United States, and about 20 years ago, when the Northern Pacific Railroad Company obtained a right of way through the reservation, and paid the Indians about $21,000 therefor, Michael Pablo received a share in the distribution of the fund, participated in the council of the Indians held in respect to the matter, and was in all respects recognized as entitled to the privileges and rights of membership in the tribe.

From these facts, and the law to be applied to them, I conclude that Michael Pablo was adopted by the Indians rightfully upon the reservation, and that he became tied to the tribes by a relationship lawfully made, and was and is, in law, an Indian sustaining tribal relations. That the Indians had right of adoption, without doing violence to the Stevens treaty of 1856, is inferable from the several acts of Congress bearing upon rights of Indians, and particularly from the provisions of section 1 of "An act to provide for the removal of the Flathead and other Indians from the Bitter Root Valley in the territory of Montana," approved June 5, 1872, c. 308, 17 Stat. 226, wherein it was provided that the President should remove as soon as practicable "the Flathead Indians (whether of full or mixed bloods), and all other Indians connected with said tribe, and recognized as members thereof, from Bitter Root Valley, in the territory of Montana, to the general reservation in said territory (commonly known as the Jocko Reservation), which by a treaty concluded at Hell Gate, in the Bitter Root Valley, July sixteenth, eighteen hundred and fifty-five, and ratified by the Senate March eighth, eighteen hundred and fifty-nine, between the United States and the confederated tribes of Flathead, Kootenai, and Pend d'Oreille Indians, and was set apart and reserved for the use and occupation of said confederated tribes."

The right accorded to all persons who are in whole or in part of Indian blood or descent, who are entitled· to allotments of land under any law or treaty, to sue in the Circuit Court of the United States, is also recognition of Congress that those who are but part Indian in blood or descent may be entitled to rights of allotments of land accorded other Indians under laws or treaties. Act Cong. Feb. 6, 1901, c. 217, 31 Stat. 760, amending Act Aug. 15, 1894, c. 290, 28 Stat. 286; 3 Fed. Stat. Ann. p. 503. The act of Congress approved April 23, 1904 (St. 1903–1904, c. 1495, 33 Stat. 302), providing for the survey and allotment of lands within the limits of the Flathead Indian Reservation, expressly authorizes allotments to be made "to all persons having tribal rights, with said confederated tribes of Flatheads, Kootenais, Upper Pend d'Oreille, and such other Indians and persons holding tribal relations as may rightfully belong· on said Flathead Indian Reservation, including the Lower Pend d'Oreille or Kalispel Indians now on the reservation, under the provisions of the allotment laws of the United States"; and by section 14 of the same act provision is expressly made for certain expenditures "for the benefit of the said Indians and such persons having tribal rights on the reservation," etc. Taking these several acts of Congress together, I gather from their language that Congress has dealt with the Indians and persons having tribal rights on the reservation with the clear intention to make no distinction between them in the extension of benefits of allotment provisions, and, by expressly including Indians and such persons as have tribal rights on the reservation, it is manifest that Congress intended to and did recognize that tribal relations might be created in a way recognized by other acts of Congress or by executive and judicial interpretation.

We find another instance of the recognition of the practice of Indian tribes, in section 1 of the act of Congress approved June 7, 1897, c. 3, "making appropriations for current and contingent expenses of the Indian department, and for other purposes" (30 Stat. 90), wherein it is provided "that all children born of a marriage heretofore solemnized between a white man and an Indian woman by blood and not by adoption, where said Indian woman is at this time, or was at the time of her death, recognized by the tribe, shall have the same rights and privileges to the property of the tribe to which the mother belongs, or belonged at the time of her death, by blood, as any other member of the tribe, and no prior act of Congress shall be construed as to debar such child of such right."

Turning now to the opinions of the courts regarding the status of persons claiming to be members of Indian tribes, we find that in the case of Sloan v. United States (C. C.) 118 Fed. 283, Judge Shiras held that:

"Recognition of persons as members of an Indian tribe might be had and allotments of land might be made where the tribe clearly deemed such person as a member; and the right of the Interior Department in making an allotment to persons other than actual resident members of the tribe was recognized where the Indians had acted in open council, and had declared persons to be members of the tribe, and entitled to share in the allotments of tribal lands."

The learned judge distinguishes between the rights of persons not recognized by the Indians as members of the tribe and those that had by action of the council been placed in tribal relation on the reservation.

In United States v. Higgins (C. C.) 103 Fed. 348, after a careful review of the class to which half-breed Indians belong, Judge Knowles used this language:

"Considering the treaties and statutes in regard to half-breeds, I may say that they never have been treated as white people entitled to the right of American citizenship. Special provision has been made for them—special reservations of land, special appropriations of money. No such provision has been made for any other class. It is well known to those who have lived upon the frontier in America that, as a rule, half-breeds or mixed-blood Indians have resided with the tribes to which their mothers belonged; that they have, as a rule, never found a welcome home with their white relatives, but with their Indian kindred. It is but just, then, that they should be classed as Indians, and have all the rights of the Indian."

In 7 Op. Attys. Gen. 746, it is said, "Half-breed Indians are to be treated as Indians, in all respects, so long as they retain their tribal relations."

The Supreme Court, in Roff v. Burney, 168 U. S. 218, 18 Sup. Ct. 60, 42 L. Ed. 442, recognized the Chickasaw Nation of Indians, and reaffirmed previous decisions declaring that the Indian tribes possess attributes of nationality, holding them to be not foreign, but domestic, dependent nations. Effect was there given to a legislative act of the Chickasaw Nation, and the validity of an Indian law, withdrawing citizenship from the wife of the plaintiff, and the consequent withdrawal from the plaintiff of all the rights and privileges of citizenship in the Chickasaw Nation was decided as determined by the authority of that nation, without being subject to correction by any direct appeal from the judgment of the Chickasaw courts.

In Nofire v. United States, 164 U. S. 657, 17 Sup. Ct. 212, 41 L. Ed. 588, it was decided that the Cherokee Nation had a right to recognize one as a citizen by adoption of the nation, and that, where there had been such adoption, jurisdiction over certain offenses was vested in the courts of the Cherokee Nation.

In Raymond v. Raymond, 83 Fed. 721, 28 C. C. A. 38, adoption through intermarriage under the laws of the Cherokee Nation was also recognized.

It is true that the stipulations and treaties entered into between the Cherokee Nation and the United States are especially referred to in these decisions, but I cite them upon the general principle that, no treaty provision to the contrary existing, the courts have recognized a general right of adoption by Indian tribes of certain persons who have lived upon the reservation and married members of the tribe, and who have affiliated with the tribes, who are themselves mixed bloods, and whose habits and associations have been and are similar to and with the adopting tribe or tribes.

Counsel for the treasurer of Missoula county relies with some confidence upon the decision of the Supreme Court of Montana in the case of Stiff v. McLaughlin, 19 Mont. 300, 48 Pac. 232. There

it was generally said in an opinion rendered by Justice Buck that the provisions of article 2 of the treaty of 1855 with the Flathead Indians, providing that there might be placed on their reservation "other friendly bands of Indians of the territory of Washington," who might agree to be consolidated with the Flathead Nation, did not authorize the adoption into the tribe of a quarter-breed Chippewa who was married to a Flathead woman. But in the case as it was presented to the Supreme Court the question of the authority of the various tribes which constituted the Flathead Nation to adopt other Indians as members of the tribes was not discussed as necessary to a decision. Upon the sufficiency of the pleaded defense the court rested its decision. If the answer had set up adoption and the right of adoption, and had pleaded more fully, I do not believe the dictum of the learned justice who wrote the opinion would have found the place that it has.

We find, too, that the executive authority of the general government has recognized the status of persons situated as Pablo is as that of tribal Indians. In an opinion rendered by Atty. Gen. Olney, reported in 20 Op. Attys. Gen. 711, he advised the Secretary of the Interior that the laws and usages of the tribe of Indians should determine the question whether any particular person was or was not an Indian, within the meaning of an agreement that had been entered into between the Sioux Nation and the government of the United States. He regarded those questions as rather of fact pertaining to local usages, and, citing the decision of the Supreme Court in Smith v. United States, 151 U. S. 50, 14 Sup. Ct. 234, 38 L. Ed. 67, advised that "presumptively a person apparently of mixed blood, residing upon a reservation and claiming to be an Indian, is in fact an Indian." In the United States v. Higgins, supra, Judge Knowles also followed the doctrine that courts will generally conform to the executive and political departments of the government in their recognition of persons as Indians, where they are at least half bloods, whose fathers were white men, and where the half blood has lived and resided with the tribe to which the mother belonged.

As a result of these several considerations, I conclude that under the facts Pablo is a ward of the government; that his ties with the Indians were long since established, and, being unbroken, still exist; and that he is therefore entitled to immunity from state and county taxes.

The injunction will be made permanent..