UNITED STATES v. PEARSON, County Treasurer, et al.

(District Court, D. South Dakota, C. D.    February 18, 1916.)

1. TAXATION ⊜5—PERSONAL PROPERTY OF INDIANS.
   Personal property issued by the government to Sioux Indians, who live on separate allotments, but maintain their tribal relations, consisting of horses, cattle, and their increase, and farm implements and other property acquired by exchange of such property or otherwise, which is derived directly or indirectly from the government and is used by the Indians on their farms, is not subject to taxation by state authorities. Such property is not absolute property of the Indians, but is held in trust for their benefit by the government for the purpose of carrying out its policy of helping them to be self-sustaining, as is evidenced by Act July 4, 1884, c. 180, 23 Stat. 94 (Comp. St. 1913, § 4121), and Act March 2, 1889, c. 405, § 17, 25 Stat. 895, which restrict the sale of cattle issued, and their increase, by the Indians to members of their own tribe.
   [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 17, 31–44; Dec. Dig. ⊜5.]

2. INDIANS ⊜31—STATUTES—EFFECT OF GRANTING CITIZENSHIP.
   The citizenship conferred on Indian allottees by Act Feb. 8, 1887, c. 119, § 6, 24 Stat. 390 (Comp. St. 1913, § 3951), did not operate to withdraw them from the supervision, control, and protection of the government, both as respects themselves and their property.
   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 23; Dec. Dig. ⊜31.]

3. INDIANS ⊜23—STATUS—PERSONAL PROPERTY.
   Under the provisions of the Enabling Act of South Dakota, Act Feb. 22, 1889, c. 180, 25 Stat. 676, 677, and article 22 of the State Constitution, reserving to Congress "absolute jurisdiction and control" over all lands within the state owned or held by Indian tribes, or by individual Indians who have not severed their tribal relations, not only the lands, but all other property issued by the government to such Indians for use thereon, remain subject to such control until Congress relinquishes the trust.
   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 15; Dec. Dig. ⊜23.]

4. INDIANS ⊜23—PERSONAL PROPERTY—TAXATION.
   That Indian allottees, to whom live stock has been issued and the agents in charge, have failed to brand the increase of such stock, as required by the statute, does not release such increase from the trust restrictions by Congress, nor render it subject to state taxation.
   [Ed. Note.—For other cases, see Indians, Cent. Dig. § 15; Dec. Dig. ⊜23.]

In Equity. Suit by the United States against John Pearson, County Treasurer of Dewey County, S. D., and Calvin M. Smith, Sheriff of said county. Decree for complainant.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Robert P. Stewart, U. S. Dist. Atty., and E. W. Fiske and George Philip, Asst. U. S. Dist. Attys., all of Sioux Falls, S. D.

James E. Truesdale, of Isabel, S. D., and Morris & Caldwell, of Sioux Falls, S. D., for defendants.

ELLIOTT, District Judge. This is a suit in equity, brought by the United States of America against John Pearson, county treasurer, and Calvin M. Smith, sheriff, of Dewey county, S. D. Upon the face of this record there is practically no dispute as to the facts. The controversy arises upon the application of the settled law to the facts as disclosed by the undisputed testimony.

[1] It appears from the undisputed record in this case that John Pearson is the duly elected, qualified, and acting county treasurer, and that the defendant Calvin M. Smith is the duly elected, qualified, and acting sheriff, of Dewey county, S. D., which county is a duly organized municipal corporation, existing under and by virtue of the laws of the state of South Dakota, within said state. It appears that Antoine Le Beau, Henry Le Beau, Eugene Standing Bull, Armstrong Four Bear, Alex Le Beau, and Thomas Low Dog are Indians, and members of the Cheyenne agency tribe of Sioux Indians, in the state of South Dakota, and have not abandoned their tribal relations; that at all times mentioned in the bill of complaint they were and are wards of the plaintiff, the United States of America, and under the guardianship and supervision of the plaintiff; that they are, and at all times named in the complaint were, residents of that portion of the Cheyenne River Indian reservation formerly situated and being in the county of Dewey, state of South Dakota; that each and all of them have been allotted Indian lands within the said Dewey county, and within the former Cheyenne River Indian reservation, which allotments were made under the provisions of the general allotment act approved February 8, 1887; that a particular description of the lands allotted to these Indians is as set forth in paragraph 3 of the bill of complaint filed herein; that each of these Indians lives, and at all times named in the complaint resided, upon his allotment, which was held by the government of the United States, subject to the trust patent referred to in the act of the United States above named, under which the allotment was made, except the Indian Armstrong Four Bear, who holds his allotment, but lived upon another allotment, made pursuant to the provisions of said statute to his mother, located in the same county; that during the year 1911 the proper officers of said Dewey county listed and assessed, and returned upon the tax rolls of that county, certain personal property against each of these Indians, consisting of horses, cattle, in one or two instances a wagon, and in another household goods; that the total tax for state and county purposes for the year 1911 against Antoine Le Beau amounted to $33.66, and at the time of instituting this action there appeared upon the books of Dewey county penalty and interest thereon amounting to $11.78, making a total tax, interest, and penalty, claimed to be due for state and county purposes for said year of 1911, in the sum of $45.44; that during the year 1912 the officers of said county listed and assessed Antoine Le Beau upon this same personal property a total tax for state and county

purposes of $42.83, which, with penalty and interest, at the time of the commencement of this action, amounted to $52.25; that during the year 1913 the officers of said county listed and assessed Antoine Le Beau upon this same personal property a total tax for state and county purposes of $22.83, which, with penalty and interest, at the time of the commencement of this action, amounted to $25.11; that during the year 1914 the officers of said county listed and assessed Antoine Le Beau upon this same personal property a total tax for state and county purposes of $23.64. It appears, further, that taxes were assessed against the personal property of the other Indians above named, for said years, in the amounts set forth in the bill of complaint, upon the property therein described, and it is unnecessary to set it forth fully herein.

It appears from the undisputed evidence that the personal property, consisting of cattle, horses, wagons, buggy, machinery, household goods, the same being all the property taxed as the property of Antoine Le Beau, and all of the property listed and taxed as the property of all of the other Indians referred to in the bill of complaint, was, at the time it was assessed, ever since has been, and now is, in the possession of the allottees, respectively, and was used by them in connection with their respective allotments as described in the bill of complaint. It is admitted that the legal title in and to said allotted lands has not passed from plaintiff, and that the same is held in trust by the plaintiff for the benefit and use of the said Indians. The court further finds that these Indians are wards of the plaintiff herein, and that the guardianship of the United States over said Indians has not been terminated.

I find from the undisputed record that this property is all of it either: (1) Issue property; that is, property issued direct by the government of the United States to the Indians, respectively. (2) Increase of such issue property. (3) Property purchased with the proceeds of the sale of trust or issue property. (4) Property purchased with the proceeds of the sale of the increase of issue property. (5) Issue property exchanged for similar property for similar use, and this consists of the increase of property received in such exchange. (6) The increase of issue property exchanged for similar property for similar use. (7) Property purchased with money given to the Indians by the United States.

Considering the foregoing classification, an enumeration of the personal property of the Indians named in the bill of complaint, assessed and distrained by the defendants, is as follows:

(1) Issue property:
First—Assessed:
  Thomas Low Dog:
    1912—One cow, issued by government.
    1912—Agricultural implements, all issued.
    1913—Same implements.
  Henry Le Beau:
    1912—Cattle, all issue stock.
    1913—Same as 1912 and its increase.

Eugene Standing Bull:

    1911—One mare, issued in 1909 or 1910.

(2) Increase of issue property:

First—Assessed:

    Antoine Le Beau—Owned cattle during years 1909, 1910, 1911, 1912, 1913, and 1914. Owned no cattle during those years, except increase from two cows issued by government to him in 1893.

    Same years—horses, all, increase of issue stock.

    Alex Le Beau—Owned cattle and horses during 1910, 1911, 1912, 1913 and 1914, all increase of issue stock and owned no other.

    Armstrong Four Bear—Assessed for horses 1912 and 1913. All horses were and are increase of issue stock inherited from his father.

Thomas Low Dog:

    1912—Eleven head of horses under three years old, six head three years old and over, all increase of issue mares inherited from his father.

    1913—Same stock and its increase.

    1912—One stallion, increase of issue stock.

Henry Le Beau:

    1912—Horses, all increase of issue stock.

    1913—Horses, same as in 1912, and their increase.

    1913—Cattle, increase of issue cattle.

Eugene Standing Bull:

    1911—Horses, increase of issue.

Second—Distrained by sheriff:

    Antoine Le Beau:

    One sorrel mare, nine years old, with colt.

    Two bay mares, three years old.

    One bay gelding, all increase of issue mares.

    Henry Le Beau:

    Two mares, two years old, and one mare, three years old, all increase of issue mares.

    Eugene Standing Bull:

    One three year old gray gelding, increase of issue mare, issued in 1909 or 1910.

    Alex Le Beau:

    Three two year old horses and one black mare.

    Thomas Low Dog:

    Two mares and a six year old colt, increase of issue mares inherited from his father.

(3) Property purchased with the proceeds of the sale of issue property:

There does not appear to be any of the original issue stock which was sold, nor does any of it appear to have been distrained. This classification should perhaps not have been made, in view of the fact that class (4) covers such property so far as this case is concerned. However, a general classification of the property of Indians would be incomplete without it.

(4) Property purchased with the proceeds of the sale of the increase of issue property:

First—Assessed:

Antoine Le Beau—In 1911 assessed for household furniture purchased with money derived from sale of increase of issue stock.

1912—Four hogs, paid for with cash from sale of increase of issue stock.

1912—Same household furniture as in 1911.

1913—One hog, one of 1912 hogs.

1913—Household furniture, same as in 1912.

(5) Issue property exchanged for similar property for similar use. This is further subdivided to include:

(a) The increase of property received in such exchange:

First—Assessed:

Eugene Standing Bull:

1911—One wagon received in exchange for increase of issue mare. (Same in 1912, 1913, and 1914.)

Alex Le Beau:

Owns some horses, increase of horses for which he traded issue cows 26 years ago.

Second—Distrained:

Alex Le Beau:

Three two year old horses and one eight year old mare, increase of horses for which he traded issue cows 26 years ago.

(6) The increase of issue property exchanged for similar property for similar use:

First—Assessed:

Antoine Le Beau:

1911—Mowing machine received in payment for horse, increase of issue stock. Cultivator, for which he traded a cow, increase of issue stock. One wagon received on similar trade.

1913—Machinery and implements, same as in 1911 and 1912.

(7) Property purchased with money given to the Indians by the United States:

First—Assessed:

Alex Le Beau:

1912—Two hogs, purchased with money paid by government to him and members of his family.

Eugene Standing Bull:

1911—Household furniture. (Same in 1912, 1913, and 1914.)

Armstrong Four Bear:

1912—One stallion, purchased with money derived from sale of inherited trust land on Yankton reservation.

Thomas Low Dog:

1912—One buggy purchased as above; also household furniture.

1913—Same buggy and household furniture.

Second—Distrained:

Eugene Standing Bull:

Bay mare with colt, and a yearling, increase of property issued to Sitting Eagle, brother of Eugene Standing Bull, and purchased by Eugene Standing Bull from Sitting Eagle.

Armstrong Four Bear:

> One mare eight years old, purchased from George La Sart with money issued by the government as trust fund.

All of these Indians testified that they never acquired any property except such as they received directly or indirectly from the government, that they acquired no property through their own efforts, and that they own nothing except what the government has given them; and this is the undisputed record. I further find that all of this property, so assessed and distrained, being the total assessment against the various Indians named in the bill of complaint herein, has been identified by the various witnesses as coming within the classifications above set forth; and this, too, is the undisputed record.

These assessments against these Indians for the years above referred to were duly perfected by the officers of said county, and the said Indians, each and all of them, failed and neglected to pay the taxes thus assessed against them upon said property, and the defendants, as tax collectors of said county of Dewey, pursuant to the statutes of the state of South Dakota, seized certain of these cattle and horses, the property of these Indians respectively, and advertised the same for sale at public auction, with a view to securing money sufficient to pay the taxes, penalty, and costs of collection, as assessed and appearing upon the tax records of said county against these Indians, respectively.

The plaintiff brings this suit for the purpose of enjoining these sales, and further asks that the assessments of taxes against these Indians and their said personal property be canceled and set aside by decree of this court, that the same be decreed void and of no force or effect, and that the same, as a cloud upon the title of the plaintiff to their respective allotments, be removed and set aside by such decree.

It is conceded by counsel for defendants that plaintiff is a proper party, and can bring and maintain a suit of this character in this court, for the purpose of obtaining the relief demanded, if the property assessed in the possession of the Indian wards of the government is not subject to taxation by the county authorities, and is held in trust by the United States for the use and benefit of such Indians. But it is contended by the defendants that the property assessed against these Indians, a portion of which was levied upon by the defendant, sheriff of said county, was not, at the time the assessment was made, or at the time of said levy, "trust property," was not owned by the United States, or held in trust by the United States for the use and benefit of any of such Indians.

It is shown by the record, and conceded by the defendants here, that horses and cattle and machinery were issued and money was paid to these Indians by the government at various times, covering a period of the history of the entire dealings of the United States with the Indians named, and the tribe of Indians to which they belong. It is admitted by the defendants that when these horses and cattle were issued to the Indians named in the bill of complaint, or their predecessors, or comembers of the tribe, such property was turned over to the Indians by the United States, and that the United States did not re-

lease its title or ownership to such property at the time of delivery of the same to the Indians. It, therefore, is unnecessary to discuss the status of the property originally issued to the Indians, or the property purchased by the funds originally paid to these Indians, by the government of the United States.

The defendants concede, therefore, that the classes of property above set forth as Nos. 1 and 7 were and are exempt from taxation by the authorities of said county. Defendants, however, insist that it cannot be said that the United States expected for all time to retain in itself the title to such property and the increase thereof, and to retain title to other property that the Indians might have exchanged for the property originally issued, as covered by the classifications above named other than 1 and 7, insisting that there is nothing in the statutes of the United States or in any of the reported decisions that seems to defendant susceptible of any such construction.

I am of the opinion that the question of the liability of the property of these Indians in the classifications above set forth to assessment by the officers of said county must be determined, in its original forms and in its changed forms, by a consideration of the congressional legislation, together with the decisions of the courts, determining the status of this property. Act July 4, 1884, c. 180, 23 Stat. 76–94 (Comp. St. 1913, § 4121), provides:

"That where Indians are in possession or control of cattle or their increase which have been purchased by the government, such cattle shall not be sold to any person not a member of the tribe to which the owner of the cattle belongs, or to any citizen of the United States, whether intermarried with the Indians or not, except with the consent in writing of the agent of the tribe to which the owner or possessor of the cattle belongs. And all such sales made in violation of this provision shall be void, and the offending purchaser, on conviction thereof," etc.

By Act March 2, 1889, c. 405, 25 Stat. 888–895, relating to the Sioux Indians, including the tribe to which the Indians named in the bill of complaint belong, provides, at section 17, as follows:

" * * * The Secretary of the Interior is hereby authorized and directed to purchase, from time to time, for the use of said Indians, such and so many American breeding cows of good quality, not exceeding twenty-five thousand in number, and bulls of like quality, not exceeding one thousand in number, as in his judgment can be under regulations furnished by him, cared for and preserved, with their increase, by said Indians: Provided, that each head of family or single person over the age of eighteen years, who shall have or may hereafter take his or her allotment of land in severalty, shall be provided with two milch cows, one pair of oxen, with yoke and chain, or two mares and one set of harness in lieu of said oxen, yoke and chain, as the Secretary of the Interior may deem advisable, and they shall also receive one plow, one wagon, one harrow, one hoe, one axe, and one pitchfork, all suitable to the work they may have to do, and also fifty dollars in cash, to be expended under the direction of the Secretary of the Interior in aiding such Indians to erect a house and other buildings suitable for residence or the improvement of his allotment; no sales, barters or bargains shall be made by any person other than said Indians with each other, * * * and any violation," etc.

This act was amended June 10, 1896 (29 Stat. 321–334, c. 398) by a provision that the Secretary of the Interior, in cases where it is ascertained that the Indians will not be benefited by receipt from the

United States of the articles of personal property mentioned in the foregoing section 17, to convert the same, or so much thereof as he may think proper, into money and pay the amount to the Indians, the payment to be a liquidation of the obligations of the United States to said Indians under that section, so far as the articles of personal property therein named are concerned. This act of March 2, 1889, was further amended by Act June 21, 1906, c. 3504, 34 Stat. 325, which authorized the Secretary of the Interior to issue to any allottee Indian entitled to benefits under said section 17, in lieu of the milch cows, mares, and implements as named therein, an equal value in good stock cattle.

The regulations of the Indian Office (430–432) made pursuant to the statutes of the United States, provide:

"When cattle are issued to Indians either for work oxen or for breeding purposes, each animal must be branded in addition to the 'ID' brand, with a private mark to indicate the person to whom it belongs. A record of such private marks must be kept in the agency office. The agent is also required to see that the increase of all issued cattle are similarly branded. * * * Where Indians are in possession or control of cattle or their increase which have been purchased by the government such cattle shall not be sold to any person not a member of the tribe to which the owners of the cattle belong, or to any citizen of the United States, whether intermarried with the Indians or not, except with the consent in writing of the agent of the tribe to which the owner or possessor of the cattle belongs. All sales made in violation of this provision," etc.

Clearly, therefore, all property issued under said section 17 of the act of 1889 remained under the supervision and control of the United States, and was held by the United States in trust for the benefit of the Indians. These cattle, purchased by the government and issued to the Indians of a tribe, were not theirs absolutely and unconditionally, but were issued for the purpose of promoting their civilization and improvement and to encourage them in the habits of industry. And it has been held that it was the right and duty of the government to protect such conditional ownership. McKnight v. United States, 130 Fed. 659, 65 C. C. A. 37.

The purpose and object of the government in its dealings with these Indians, and in the relation that it maintains toward them and their property, is to encourage habits of industry and reward labor, and to encourage them to undertake the cultivation of the soil, the raising of stock, or engage in pastoral pursuits, enabling them to support themselves, and as a means of obtaining a livelihood. 130 Fed. 663, 65 C. C. A. 37. The personal property in the case at bar originally issued to these Indians named in the bill of complaint, or their ancestors, or to other members of the tribe to which these Indians belong, was purchased with the money of the government and was furnished to the Indians to induce them to adopt the habits of civilized life. It was in fact the property of the United States, and was put into the hands of the Indians to be used in the execution of the purpose of the government in reference to them. 130 Fed. 667, 65 C. C. A. 37; United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532.

These Indians named in the bill of complaint are yet wards of the nation, in a condition of pupilage or dependency, and have not been

discharged from that condition. They each of them occupy allotments, with the consent and authority of the United States, as a part of the national policy by which the Indians are to be maintained, as well as prepared for assuming the habits of civilized life and ultimately the privileges of citizenship. To tax cattle or personal property issued to these Indians by the government of the United States, as a part of the national policy by which the Indians are to be maintained, as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship, is, in my judgment, to tax an instrumentality employed by the United States for the benefit and control of this dependent race, and to accomplish beneficent objects with reference to a race, over which the Supreme Court of the United States has said that:

"From their very weakness and helplessness, so largely due to the course of dealings of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power." United States v. Rickert, 188 U. S. 437, 23 Sup. Ct. 480, 47 L. Ed. 532: United States v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228.

One of the questions submitted to the Supreme Court of the United States, in United States v. Rickert, was as follows: Was the personal property, consisting of cattle, horses, and other property of like character, which had been issued to these Indians by the United States, and which they were using upon their allotments, liable to assessment and taxation by the officers of Roberts county? Answering this question, the court says:

"The answer to this question is indicated by what has been said in reference to the assessment and taxation of the land and the permanent improvements thereon. The personal property in question was purchased with the money of the government—was furnished to the Indians in order to maintain them on the land allotted to them during the period of trust estate, and to induce them to adopt the habits of civilized life. It was, in fact, the property of the United States, and was put into the hands of the Indians to be used in execution of the purpose of the government in reference to them. The assessment and taxation of the personal property would necessarily have the effect to defeat that purpose."

Counsel for defendant call my attention to the decision in the Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848; but the Supreme Court says in United States v. Rickert, supra, in determining that the principles which were announced as to the nature and character of an allotment of Indian lands and the interest of the United States therein, as trustee, before the expiration of the period for their final disposition, was in no way affected by the decision in the Heff Case, which dealt with the subjection of the allottee Indians in their personal conduct to the police regulations of the state of which they had become citizens, and this is cited with approval in McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. Ed. 566.

In an opinion by Judge Sanborn in United States v. Gray et al., 201 Fed. 291, 119 C. C. A. 529, Judge Sanborn referred to the relation of the government to these Indians, and specifically mentioned personal, property as follows:

"The leases of these lands, * * * the tools, animals, houses and improvements, and other property furnished to these Indians by the United

States, and the proceeds and income from all these, are the means by which the nation pursues its beneficent policy of protection and instruction and exercises its lawful powers of government."

The Indian reservations and funds derived from the release of the Indian right of occupancy, the lands allotted to individual Indians, but still held in trust by the nation for their benefit, the improvements upon these lands, the agricultural implements and domestic animals, and other property of like character, furnished to them by the nation to enable them or induce them to cultivate the soil and to establish and maintain permanent homes and families, are the means by which the nation pursues its wise policy of protection and instruction and exercises its lawful powers of government.

The case of United States v. Thurston County, Neb., 143 Fed. 287–289, 74 C. C. A. 425, emphasizes the fact that the lands held in trust are exempt from state taxation *because they are the instrumentality lawfully employed by the nation in the exercise of its powers of government to protect, support, and instruct the Indians.* This same case holds proceeds of inherited Indian lands exempt. It further determines that no change of form of the property divests it of the trust. The substitute takes the nature of the original and stands charged with the same trust. The authorized sale of trust property by a trustee discharges the property sold from, and charges the proceeds of the sale in the hands of and under the control of the trustee with the trust.

[2] It has been held by the Circuit Court of Appeals for the Eighth Circuit, by the Supreme Court, and by other courts, that the citizenship conferred upon the allottees under and by virtue of the act of February, 1887, did not operate to withdraw them from the supervision, control, and protection of the government, but that such Indians still remained the wards of the government, and therefore these Indians and their property, named in the bill of complaint, are directly within the protection of the rules announced in the foregoing citations. McKnight et al. v. United States, 130 Fed. 659, 65 C. C. A. 37; United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; Farrell v. United States, 110 Fed. 942, 49 C. C. A. 183; Eells v. Ross, 64 Fed. 417, 12 C. C. A. 205; United States v. Logan (C. C.) 105 Fed. 240; United States v. Flournoy Live Stock & Real Estate Co. (C. C.) 69 Fed. 886.

All subjects over which the sovereign power of the state extends are objects of taxation, but those over which it does not extend are, upon the soundest principles, exempt from taxation. The sovereignty of a state extends to everything which exists by its own authority or is introduced by its permission, but does not extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States.

[3] The Enabling Act of February 22, 1889, of the state of South Dakota (25 Stat. 676, 677, c. 180), and the Constitution adopted by the state of South Dakota (article 22), provide that all lands within the state, owned or held by Indian tribes, or by individual Indians who have not severed their tribal relations, shall remain under the absolute,

jurisdiction and control of the Congress of the United States. Act May 8, 1906 (34 Stat. 182, c. 2348), under which the larger number of Indians on the Cheyenne River reservation were allotted, provides that until the issuance of fee simple patents all allottees to whom trust patents shall thereafter be issued shall be subject to the exclusive jurisdiction of the United States.

The attempt on the part of the state to use the taxing power of the state by an assessment of this personal property in the possession of these Indians, used by them upon their allotments, under the supervision of the government of the United States, the same being a means employed by the government of the United States in pursuance of the Constitution, is an abuse, because it is the usurpation of a power which the people of a single state cannot give. The power to tax involves the power to destroy, and the power to destroy may defeat and render useless the power to create, and there is a plain repugnance in conferring upon one government the power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exercises the control. A state has no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. United States v. Rickert, supra.

The civil and political status of the Indians does not condition the power of the government to protect their property or to instruct them. Their admission to citizenship does not deprive the United States of its power, nor relieve it of its duty, to control their property, to protect their rights from the rapacity and faithlessness of the members of the superior race, to discharge faithfully its legal and moral obligations to them, and to execute every trust with which it is charged for their benefit. This personal property named in the bill of complaint is, in the opinion of the court, trust property, and an instrumentality lawfully employed by the United States in the exercise of its lawful governmental authority, and is therefore necessarily exempt from all taxes and interference. United States v. Thurston County, Neb., 143 Fed. 287–289, 74 C. C. A. 425.

I am inclined to go even farther than is necessarily involved in the foregoing. The findings in this case determine that the Indians named in the bill of complaint are members of the tribe of the Cheyenne River Sioux Indians. They have a tribal organization, and are therefore subject to the exclusive jurisdiction of the United States. This, in view of the provisions of the Enabling Act above quoted, and that personal property of Indians having such tribal organization is exempt from taxation, has been recognized. United States v. Higgins (C. C.) 103 Fed. 348; United States v. Heyfron (C. C.) 138 Fed. 964. I am of the opinion that it rests entirely with the United States, as the trustee and guardian of these Indians and of this tribe of Indians, to determine when it will relinquish its trust and turn the property over to the Indians to do therewith as they may choose.

This doctrine is applicable, not only to the trust allotments, but to all property issued by the government of the United States, consisting

of horses, cattle, and farm implements, together with purchases made by them with the money paid to them and used in and upon the trust allotments of the individual Indians in pursuance of the policy of the United States for the good of the Indian and tending to his protection and development. This governmental policy has been recognized in the decisions above quoted, and especially in United States v. Rickert, supra.

Under this decision, the changed forms of the property held in trust, as time brings such changes about in live stock and other personal property of the Indians, even to exchanges between themselves of trust property, are impressed with the trust. Even the substitute takes the nature of the original and is charged with the trust. The authorized sale of trust property by a trustee discharges the property sold from, and charges the proceeds of the sale, in the hands of and under the control of the trustee, with the trust. United States v. Thurston County, Neb., supra.

The defendants contend that, even admitting the foregoing, all of the personal property of the Indians named in the bill of complaint is subject to taxation, except the original property issued to the Indian. This position, in my judgment, is not consistent with the foregoing facts, considered in the light of the relation the government bears to these Indians, or to the finding that the title of all of this property is really in the government of the United States, in trust for the Indians, and entirely disregards the duty the government has assumed to supervise, control, and protect these Indians, maintaining tribal relations, in their property interests, until such time as the patent in fee simple is issued to their allotted lands and they are released from the guardianship of the plaintiff. This personal property issued to these Indians was in fact the property of the United States, and was put into the hands of the Indians to be used in the execution of the purpose of the government in reference to them. It is not pretended that the government has ever consented to a disposition of any of this property or of its increase.

[4] It is insisted by defendants that it was the duty of the Indians to brand the increase of stock issued, and of property purchased, "ID" or "TF," or both, and thus keep the identification definite and certain, and that, because they have failed to comply with the regulations of the Department of the Interior in this respect, the property not so branded is released from the trusteeship in favor of the plaintiff. I am of the opinion that no act of these Indians, or the failure to act by them or the agent in charge, in accordance with the prescribed regulations with reference to the marking of this property, could affect the trust with which this property was impressed, or the right of the United States in said property, or its duty to protect said Indians in the possession and use of this trust property.

No act or omission of the Indians or of the state authorities can impair the trust restrictions upon this personal property or its increase. United States v. Osage County, 216 Fed. 883, 133 C. C. A. 87; Bowling v. United States, 233 U. S. 528, 34 Sup. Ct. 659, 58 L. Ed. 1080. Agents and officers of the United States have no authority to waive

exemptions of the United States or to submit the property of the United States to state authorities. Stanley v. Schwalby, 162 U. S. 255–270, 16 Sup. Ct. 754, 40 L. Ed. 960; United States v. Lee, 106 U. S. 196–205, 1 Sup. Ct. 240, 27 L. Ed. 171; Carr v. United States, 98 U. S. 433–438, 25 L. Ed. 209. The claim of the defendants, therefore, that because this increase of the original issue was not branded "ID" or "TF" by the Indians, or Indian agents, it is not impressed with the trust, cannot be sustained.

Defendants contend that, there being no statute fixing the time or the condition under which this trusteeship shall be released by the government, therefore the nature of the property and the conditions under which the Indians traffic in the property establish that the government has abandoned its title and trusteeship. A sufficient reply to this is that the court finds that this is trust property. The trust, once being established, follows the increase of the property and attaches to all such property in all of its changed conditions. The fact that Indians exchange and barter it with each other is consistent with the statute of the United States above referred to and the policy of the government in its treatment of these Indians.

The defendants suggest that there is an implied termination of this trusteeship on the part of the government, or an implied divesture of its title, and that by reason of the character of the property, and that it is hard to identify that the limit of the period of the protection of the property of the United States and its increase, is one generation of the live stock after the original parent stock. No basis for such suggestion is urged, except that "it is hard to identify," and it is suggested that this limitation would be reasonable, because it would be easy to identify the one generation of increase.

The reply to this is that the trust abides with the property, with its increase, with it in all of its changed forms, indefinitely, so long as it can be traced. In my judgment it is not a question of "easy identification." It is simply a question of *identification*. The record in this case conclusively shows that all of this property that has been assessed and distrained, of these various Indians named in the bill of complaint, is the original issue stock or property, or belongs to one or the other of the subdivisions into which the property has been above classified. This identification is definite and certain, with absolutely no testimony to dispute such identification—nothing tending to throw a suspicion upon it.

This limitation cannot be applied by the courts, for the elementary reason that courts cannot terminate the trusteeship of the United States. It is for the plaintiff, and the plaintiff alone, to say when this trusteeship shall terminate, and under the law as it now exists, and the policy of the government toward these Indians and their property, it continues until such time as fee simple patents are issued to their allotments, and tribal relations severed, and the relation of guardian and ward terminated. I repeat, under the undisputed testimony in this case, all of this property belongs to that subdivision or classification above set forth, and as above specified. It is impressed with the trust, though some of it came into existence long after the death or

disposition of the original issue, and this property, with its increase, will continue impressed with this trust until such time as Congress sees fit to terminate the trusteeship of the United States, or so long as it is capable of identification. I repeat that there is no question of identification here. There is no dispute upon that proposition. All of this property is the increase of the original issue of stock, implements, and money, identified and classified as above set forth, and it is the undisputed evidence in this case that no other property has been intermingled with it.

Argument has been made in behalf of the defendants that personal property is hard to trace, and therefore that the rule ought not to be applied that is laid down in Re Rickert v. United States and United States v. Thurston County, supra. It is not a question of whether or not it is "hard to trace" or "easy to identify." The question is: Can the property in the possession of these Indians be identified definitely and certain as belonging to either of the classes or subdivisions above enumerated? Without enumerating them here, I am of the opinion that any and all of such classes of property that can be identified are impressed with this trust, and not subject to taxation.

I may say, however, that I am of the opinion that any property in the possession of these Indians that cannot be so traced and identified as issue property, the increase of issue property, as property proceeds of the sale of issue property, property purchased with the proceeds of the sale of the increase of issue property, as property for which similar issue property has been exchanged for similar use, as the increase of property received in such exchange, as the increase of issue property exchanged for similar property for similar use, or property purchased with money given to the Indians by the United States, is not impressed with the trust, and therefore is subject to taxation. I therefore conclude:

1. That the taxation for state and county purposes of this personal property in the possession of the Indians named in the bill of complaint herein interferes with the execution of a wise governmental policy inaugurated and pursued consistently by the government over the period of a great number of years, and which is within the power of the government to undertake and carry out.

2. That the Indians named in the bill of complaint herein are wards of the plaintiff, have not abandoned their tribal relations, the periods of restricted alienation have not expired as to their trust allotments, and the property involved in this action is the property of the government of the United States, impressed with the trust, for the benefit of said Indians, and is within the exclusive jurisdiction and control of the plaintiff.

3. That the original issue of property to these Indians and to the members of the tribe of Indians to which they belong, was the property of the plaintiff, impressed with a trust for the benefit of the Indians respectively, issued pursuant to the policy of the United States toward these Indians heretofore fully set forth, and that this trust and ownership by the plaintiff follows the increase of issue property, and is applicable to all of the classes into which the same has been herein

divided, and will continue until such time as the United States sees fit to terminate the relation of guardian and ward between itself and the said Indians.

4. That in connection with the classification of property above named I am of the opinion that it is not a question of the remoteness from the original trust property that determines the question of the right to tax, but that the trust character of such property continues just so long as there can be an identification of it, and a determination that it belongs to either of the classifications, numbered 1 to 7, inclusive, set forth herein.

I am therefore of the opinion that the issues in this case must be resolved in favor of the plaintiff and against the defendants, and that judgment should be entered in accordance with the prayer of the bill of complaint filed herein.

It is so ordered.